Clancey *v.* Houdlette.

---

† CLANCEY *versus* HOUDLETTE & *als.*

Where the proprietors of the Kennebec Purchase in their grants bounded their grantees at *high water,* their subsequent *vote* to extend such grants to *low water,* did not operate to enlarge their original grants.

In the grant of James I., of England, of all the territory of New England to the council of New Plymouth, was also included all the soils, grounds, creeks, seas, rivers, islands, waters and all and singular the commodities and jurisdictions both within the said tract of land lying upon the main, as also within the said islands and seas adjoining.

No surrender of the subject of that grant, or any part thereof, was afterwards made to the sovereign authority.

Under the colonial ordinance no title to the flats, beyond one hundred rods, could be acquired by virtue of owning the upland adjoining.

But the owners of flats beyond that distance, which are subject to the flux and re-flux of the tide, are liable to be disseized by an exclusive and adverse possession.

Such *disseizin* continued for twenty years divests the owner of his title.

A possession open, notorious and exclusive, such as the character of lands so situated will admit, showing a *disseizin* of the true owner, if less than twenty years, will authorize the disseizor to maintain an action of trespass against a mere wrongdoer.

Where upland is conveyed by deed and by a verbal agreement the possession of the flats adjoining is transmitted to the grantee, such possession if continued for twenty years will ripen into a perfect title, and if less than twenty years, a stranger to the title cannot intermeddle with the possession.

Clancey *v.* Houdlette.

On Report from *Nisi Prius*, Cutting, J., presiding.

Trespass *quare clausum*. The general issue was pleaded.

After the evidence was out, it was agreed to submit the cause, upon so much of it as was admissible, to the decision of the full Court.

The *locus in quo* was the flats at the confluence and between the Kennebec and Eastern rivers. Over these flats the tide ebbs and flows leaving them bare at low water.

The acts complained of (entering, cutting and carrying away the grass,) were done on that part of it more than one hundred rods from the upland, and the value of the grass was admitted.

Plaintiff claimed title under mesne conveyances from the Proprietors of Kennebec Purchase, and also by possession.

The evidence tended to show, that the owners of the upland had for seventy-five years occupied and controlled these flats.

Plaintiff's title to the upland by deed was not in dispute.

He introduced the vote of the Proprietors of Kennebec Purchase, by which they attempted to enlarge their previous grant of the upland adjoining the premises, to low water mark.

The grants and deeds under which plaintiff claimed are referred to in the opinion of the Court.

*Hubbard*, for defendants, maintained, 1st. That the grants and deeds under which plaintiff claimed limited him to the upland.

2. That he could not claim by virtue of the colonial ordinance, as it was more than one hundred rods from the upland.

3. There was no such possession as the law recognized to gain rights.

4. But by the common law the title to the land between high and low water mark was in the king, and the rivers and their shores over which the tide ebbs and flows. *Com.* v. *Alger*, 7 Cush. 67.

King James the 1st, granted to the council of Plymouth

the territory of New England, (including the flats in controversy,) a portion of which, embracing these flats, was subsequently granted to the colony of New Plymouth, who in their grants never included any rivers and their appurtenances. The flats remain vested in the colony.

But the colony by their ordinance, which is held to operate as a grant, assigned them to the proprietors of the upland, but not to exceed one hundred rods. The State succeeding to the colony, and their rights and property, now holds the same beyond that distance.

5. As citizens of the State, defendants had equal rights with plaintiff to cut the grass beyond the one hundred rods.

*Ingalls & Stinson,* for plaintiff.

To lands thus situated, a good title can be acquired by deed or by possession.

1. By deed. A deed of the upland bounded on the water carries the title to the flats. *Lapish* v. *Bangor Bank,* 8 Maine, 85; *Storer* v. *Freeman,* 6 Mass. 435; *Parker* v. *Bates,* 13 Pick. 260; *Sparhawk* v. *Bullard,* 1 Met. 95; *Austin* v. *Center,* 1 Mass. 231; *Lufkin* v. *Haskell,* 3 Pick. 356: *Com.* v. *Alger,* 7 Cush. 63; *Thornton* v. *Foss,* 26 Maine, 402.

This right to the adjacent flats is not restricted to one hundred rods. It rests on usage, and not the ordinance of 1641, and in no case has this question of extent arisen.

The vote of the propriety of Nov. 11, 1761, extends the grant of lot 84, (the farm in controversy,) to the water, that is, to the water at all times, or low water. 8 Maine, 85.

2. By possession. A valid title to such lands may be acquired by possession, open, exclusive, claiming ownership.

The long continued possession in this case is evidence of a grant.

The plaintiff had possession whether he had title or not, and can maintain this action against defendants, who were wrongdoers, for the disturbance of his possession.

TENNEY, J.—It is admitted by the defendants, that they cut the grass as alleged in the writ; and by the plaintiff, that it was done at a place more than one hundred rods from the upland. It appears from the evidence, that the grounds on which the alleged trespass was committed, were on a point of land extending between Kennebec and Eastern river, to their junction with each other, and where the tide ebbs and flows; that the land is covered at high and is bare at low water at ordinary states of the tides.

The plaintiff claims to maintain his title to the land under deeds of conveyance of the premises; and also by possession. He introduced a deed to himself from his father, David Clancey, dated Oct. 1, 1839, which describes a parcel of land, as follows:—a certain parcel of land situate upon the neck of land between Kennebec and Eastern rivers, and is the southerly part of said neck, and beginning upon the west side of Eastern river at the south line of Capt. Converse Lilley's land, at a rail fence, thence running by said Lilley's land west thirty degrees north across the neck aforesaid to Kennebec river, thence bounded westerly by Kennebec river, running down said river to the southerly point of said neck, and thence bounded easterly by Eastern river from said point, up Eastern river to the bounds first mentioned. The title of the plaintiff's grantor was by a deed from Charles Call, who had all the rights of Philip Call, jr., at the time of the decease of said Philip, dated May 9, 1799, containing a description similar to that in the deed to the plaintiff. Philip Call, jr., held under a grant from the Proprietors of Kennebec Purchase, dated May 8, 1760, describing a parcel of land as follows:—"Beginning on Kennebec river at a marked tree on said river, on the southwesterly corner of Philip Call, sen'r., his land, from thence to run east thirty degrees south one hundred and seventy-six poles, to Eastern river, which line runs on the southerly line of Philip Call, sen'r, his land, thence to run southerly and southwesterly down said Eastern river, on the water's edge, to the southerly point of the neck of land between the Kennebec and the

said Eastern river, at high water, thence to run northerly up Kennebec river to the first mentioned bounds."

It is very apparent that the grant to Philip Call, jr., did not cover the land in dispute, it being entirely below high water.

The vote of the Proprietors of Kennebec Purchase, passed Nov. 11, 1761, if admissible in evidence, can have no effect to enlarge the boundaries of the land conveyed to Philip Call, jr.

If no title to the flats was acquired under the grant to Philip Call, jr., the rights of the plaintiff thereto must be founded upon a disseizin of the Proprietors, made by him or some one under whom he claims.

When the description of land conveyed in the grant of the Proprietors of Kennebec Purchase to Philip Call, jr., is compared with those in the deeds to David Clancey from Charles Call, and to the plaintiff from David Clancey, it will be perceived that the words "high water," in the former, are omitted in the latter. But when the whole is examined, it is at least doubtful whether it was the intention of the parties in the two last named deeds to vary the boundaries of the land as acquired under the Proprietor's grant. And from the view which we have taken of the second ground, in which the plaintiff attempts to maintain this action, it does not become important, that a construction should be given to the language of the description of the land in the deeds to the plaintiff and that to his grantor.

Had the plaintiff such rights, acquired by possession, as will enable him to maintain this action against the defendants, who claim no right to the land by possession or otherwise ?

By the letters patent to the council of New Plymouth, dated Nov. 3, in the 18th year of the reign of James I., of England, he granted the territory described, "together also with all the pine lands, soils, grounds, creeks, inlets, havens, ports, seas, rivers, islands, waters, fishings, mines, minerals, precious stones, quarries, and all and singular the commodi-

ties and jurisdictions, both within the said tract of land lying upon the main, as also within the said islands, and seas adjoining." By this grant, the king was divested of his title in the premises, so that the principle, that he is supposed always to be in possession, and no disseizin can be effected, did no longer apply to these lands; but they were liable to disseizin, so far as they were susceptible of an adverse and exclusive possession.

No surrender of the subject of the grant, or any part thereof, was made to the sovereign authority, after the delivery of the letters patent to the council of New Plymouth, so that the power to disseize the owner of the land was taken away.

The lands in controversy could not have been held by the plaintiff under the colonial ordinance of 1641, which is a part of the common law of this State, being more than one hundred rods from the plaintiff's upland adjoining; but they were of a character to be held by such exclusive and adverse possession, that the owner thereof could be disseized. Such lands have always been subjects of conveyance by deed, like uplands, though they have not been attended by all the incidents belonging to the latter, such as carrying the right to adjoining flats, destitute of grass, under the colonial ordinance, without being embraced in the description. "A riparian proprietor with shore flats adjoining may convey his upland without his flats, or his flats without his upland." *Barker* v. *Bates & al.* 13 Pick. 255; *Adams* v. *Frothingham*, 3 Mass. 360. The conveyance of salt marsh or thatch banks for salt hay by metes and bounds is as common as the conveyance of any other lands. *Lufkin* v. *Haskell*, 3 Pick. 356. The fact, that they are covered with water at every tide, does not take away the power of a person to disseize the proprietor of them. The possession may not be so perfect in all respects, and at all times, as of higher lands, but this does not preclude an exclusive and adverse occupation; the causes which will prevent the actual use of the land, when the water is upon

them, by the one, who is in possession when they are bare, will exclude another from obtaining the possession during the same time. Rights in, and perfect titles to such property, have been obtained by disseizin. *Sparhawk* v. *Bullard*, 1 Met. 95; *Thornton* v. *Foss*, 26 Maine, 402.

In looking into the evidence in the case, it appears, that for more than seventy-five years, the flats on which the acts complained of in the plaintiff's writ are admitted to have been done, have been mowed and depastured, by the successive occupants and owners of the upland described in the grant from the proprietors of Kennebec Purchase to Philip Call, jr. And when the upland has been conveyed, the possession taken by the purchasers under such deeds of the upland, has been simultaneously taken of the flats. This possession, by the evidence, has been open, notorious and exclusive, and comporting with the usual management and improvement of a farm by its owner, so far as such management and improvement could take place upon land of the like character. Evidence was introduced by the defendants, that the cattle of others living in the same vicinity were permitted to go upon this land for pasturage; but it appeared further, that this was only when such cattle strayed from adjoining lands without the agency of their owners, who did not at the time claim the right to thus occupy the flats, but conceded the right of the owner of the plaintiff's upland to the exclusive use thereof.

From the facts in the case, it may be well inferred, if the flats were not embraced in the several conveyances of the upland, under which the plaintiff claims after the grant to Philip Call, jr., that by a verbal agreement, the possession of the flats was transmitted from the grantors to the grantees, which would create a perfect title, if continued for the term of twenty years. But if this were not the case, the evidence is plenary, that the plaintiff has held them in such a manner from the time of the conveyance of his father, David Clancey, to him, as to constitute a disseizin, and authorize the maintenance of an action for the acts admitted,

as an invasion of his rights, although the time during which such possession has been in the plaintiff has been less than twenty years. The defendants being strangers to the title, cannot invoke it in their defence, in an action of trespass.

According to the agreement of the parties, the defendants must be defaulted, and damage for the sum of seven dollars and fifty cents.