Illinois Steel Co. vs. Bilot and wife.

*By the Court.*— Motions denied.

Illinois Steel Company, Respondent, vs. Bilot and wife, Appellants.

*December 10, 1900 — March 19, 1901.*

*Waters: Title to lake bed: Patents, when void: Public trust: Adverse possession: Artificial filling: Ejectment: Riparian rights: Elements of actual possession: Statutes construed: Usual improvement: Hunting and fishing.*

1. Land covered by the waters of lakes or ponds, or by water partaking of like character as regards public rights, though in form conveyed by a federal or state patent, is vested in the state the same

Illinois Steel Co. vs. Bilot and wife.

after such conveyance as before, such conveyance, as to such land, being absolutely void.

. 2. The title to land of the character mentioned, in the territory out of which the state of Wisconsin was formed, prior to such formation, was in the United States in trust to preserve to the people of prospective states the enjoyment of the waters covering the same to the line of ordinary high-water mark, to the same extent as tidal waters are enjoyable by the rules of the common law. When this state was admitted into the Union such trust as to such land within the boundaries devolved upon it and there remains, for it is powerless to divest itself of the trust so far as its preservation is necessary to maintain in all its, integrity the character of such waters.

:3. The presumption as regards land covered by water of the character above indicated is that the trust mentioned attached thereto before the government survey was made, and that the extension of such survey over and the conveyance of such land in form was void; or that a trust of a like character attached to the land by reason of the shore line being extended by erosion.

-4. No title can be obtained, by adverse possession for twenty years, to land held by the state in any capacity.

5. The title to land held by the state in trust to preserve to the people thereof the enjoyment of lakes and ponds does not change by artificial filling so as to raise the surface above the level of the water.

·6. Adverse possession of land covered by water, which is the subject of private ownership, may be acquired by any means which actually and notoriously exclude the true owner therefrom, effectually disseising him thereof. Other means than physical exclusion by residence thereon or by inclosing the same will accomplish it.

·7. The mere ownership of the shore, where title stops at the water's edge by reason of the public character of such water, does not entitle one to maintain ejectment to obtain possession of land beyond the water's edge.

8. Private interests in land, if there be any below the line of ordinary high-water mark of public waters, is *prima facie* incident to the ownership of the shore, and if title to the latter be divested from one by adverse possession, the interests which are incidental thereto pass with it.

·On *motion for rehearing:*

9. A *prima facie* paper title in plaintiff, established in an action of ejectment, does not entitle him to recover as a matter of law in the face of evidence tending to show that the premises in controversy are not subject to private ownership because of being part of the bed of a lake.

10. Though the government survey and plat of premises in controversy shows them to be upland, and the mapping thereof into lots and blocks by a person claiming to be the owner indicates the same, the physical situation, as to whether such premises are or are not a part of the bed of a lake, will prevail.

11. It is not necessary that a particular locality should be wholly covered by water constantly, or be covered sufficiently to be susceptible of navigation, to give thereto the character of a lake bed as regards title thereto. If a body of water is not a river, yet is reasonably constant in character, it is a pond or lake, and the limits thereof are the natural shore though water does not constantly stand at that point.

12. If a plaintiff in ejectment establishes *prima facie* paper title to the *locus in quo*, he is not entitled to recover as a matter of law in the face of evidence tending to show that the premises are submerged by water and are appurtenant to a shore the title to which has been divested from the true owner, so called, by adverse possession.

13. The elements of actual possession necessary to draw to it constructive possession, when an adverse claim to real estate is founded on color of title under sec. 4211, Stats. 1898, are the same as actual occupancy under sec. 4213, as construed by sec. 4214, though the evidence deemed sufficient to establish occupancy under the latter sections may not be so deemed under the former, the circumstance of color of title being of itself significant as to the nature of the possession.

14. The only substantial difference between adverse possession under sec. 4211, Stats. 1898, and such possession under sec. 4214, is that under the former actual possession is extended by construction to the limits of the land described in the paper conveyance or judgment constituting the basis of color of title, while under the latter the adverse claim is limited by the actual adverse occupancy.

15. When unexplained actual occupancy for the requisite length of time has been clearly established, either under sec. 4211, Stats. 1898, or secs. 4213, 4214, the presumption of seisin in the true owner within such time disappears, and the presumption that the requisites of adverse possession have been complied with by the occupant arises under sec. 4210.

16. No particular kind of inclosure, nor any inclosure, is required to establish adverse possession as a matter of fact under sec. 4214, Stats. 1898; but if such an inclosure is relied upon to establish such possession as a matter of law, it must be of a substantial character, though not necessarily artificial, so as to be effective as a protec-

Illinois Steel Co. vs. Bilot and wife.

tion against outside interference in adapting the premises to some suitable use.

17. If a *usual improvement* is relied upon to establish adverse possession, an inclosure of any character, partly or wholly marking the boundary claimed, or any other method of clearly defining such boundary, accompanied with circumstances satisfactory to a jury to establish the essential facts, is sufficient.

18. A *usual improvement*, within the meaning of sec. 4214, Stats. 1898, does not require improvement of the land in value, but any actual use thereof to which it is adapted and to which the owner or one claiming to be the owner might reasonably devote it. Occupation of a locality for a burial lot, or some other purpose that would partially or wholly destroy its value, may be as effective an improvement as any other, according to the circumstances.

19. What will constitute actual possession in the sense of being a usual improvement of real estate within the meaning of sec. 4214, Stats. 1898, varies according to the character of the land, its location, and all circumstances bearing on the question. That there must be a *usual improvement*, where that is relied upon, is a matter of law; what is such an improvement is a matter of fact.

20. Continued, exclusive, notorious use of premises covered by water for the purpose of hunting and fishing, with other circumstances, may tend to establish adverse occupancy so as to carry a case to the jury, under proper instructions, to say whether there was such an occupancy as to constitute disseisin of the true owner.

21. Actual occupancy of premises, so as to indicate at every instant of time, by mere observation, the extent of the hostile use, is not necessary to satisfy sec. 4214, Stats. 1898. It need be only such continuous, exclusive, hostile use as in the judgment of the jury, under all the circumstances, is sufficient to notify the true owner, actually or constructively, of the invasion of his rights and the actual extent thereof.

[Syllabus by MARSHALL, J.]

APPEAL from a judgment of the superior court of Milwaukee county: J. C. LUDWIG, Judge. *Reversed.*

Action in ejectment. The complaint was in the usual form. The answer contained a plea of the twenty-year statute of limitations. Sec. 4207, Stats. 1898. The defense thus pleaded was the one relied upon on the trial. To maintain plaintiff's case evidence was produced showing *prima*

*facie* record title in itself of a portion of two lots in fractional section 33, township 7, range 22 E., and competent evidence that such portion includes the premises in dispute.

The evidence on the part of defendants was to the following effect. In 1872, theretofore, and thereafter, except, as artificially changed, the territory called "Jones Island," which includes the premises in controversy, was covered by the waters of Lake Michigan. The water was quite shallow in many places and in others was as much as nine feet deep. A man by the name of Truher, at the time specifically stated, had a house on the submerged territory, supported in some way in the shallows or resting on a piece of made land. Just how that was does not clearly appear. He pretended to exercise dominion over the entire territory, and, so pretending, he prevented any person from locating thereon without his permission. He sold his house and claim of title to one Jacob Muza in 1872, making no paper transfer of the property, however. There were then about nine settlers on the island. He made a verbal transfer of the house and authorized his grantee thereof to exercise the same control that he had over the entire territory. Muza took possession of the house and such possession of the territory as was practicable under the circumstances, and continuously thereafter asserted dominion over the same, and enforced his claims by preventing any person from locating thereon without his permission. Evidence was given showing the precise condition of the territory in 1872, theretofore, and thereafter, except as artificially changed, as follows:

Muza testified that when Truher gave him the property it was all submerged by water and mud as deep as over his head; that when he gave defendant permission to locate, the particular place allotted to him was covered by water so that it was of no use until artificially raised above the level of the water. A witness, Jones, testified that the en-

tire territory was covered by water in 1855; that sail and fishing boats used to go right through what is now the center of the island; that it was all submerged with water, but that it was deeper sometimes than at others. One Zelin testified that the premises claimed by defendant, before they were filled, were covered with water from four to eight feet deep; that defendant was three or four years filling up the property, and that some part of the territory is still covered by water. Witness Kunka testified that he built a house on the island, by permission of Muza, in 1872; that he bought thirty feet from Muza's house; that the whole territory was then covered with water from four to ten feet deep; that it was all marsh and water till filled. Defendant testifies that Muza pointed out to him the place which he might occupy, and that he commenced filling up some thirteen years before the commencement of the action; that when he commenced to make the fill it was all covered with water to a depth of several feet; that he got a small piece of filled territory of one Zelin, and that he worked out from that in filling what Muza permitted him to occupy; that he commenced filling his lot as soon as he got permission from Muza, and soon after built a house thereon, which he occupied thereafter all of the time down to the commencement of the action.

At the close of the evidence the court directed a verdict in plaintiff's favor in accordance with the prayer of the complaint. A judgment was accordingly entered establishing title in fee to the property in plaintiff, with all the incidents of such a title, and according to the statute in such cases.

For the appellants there was a brief by *Fiebing & Killilea* and *M. C. Krause*, and oral argument by *O. J. Fiebing*.

For the respondent there was a brief *Van Dyke & Van Dyke & Carter*, and oral argument by *W. E. Carter*. To the point that adverse possession was not established, they

cited *St. Croix L. & L. Co. v. Ritchie*, 78 Wis. 492; *Taylor v. Rountree*, 28 Wis. 391; *Ladd v. Hildebrant*, 27 Wis. 135; *Austin v. Holt*, 32 Wis. 478; *Mission of the I. V. v. Cronin*, 143 N. Y. 524; *Wheeler v. Spinola*, 54 N. Y. 377; *Thompson v. Burhans*, 61 N. Y. 52; *Miller v. Long Island R. Co.* 71 N. Y. 380; *Thompson v. Burhans*, 79 N. Y. 93; Anderson, Law Dict. IMPROVE and IMPROVED LANDS; Cent. Dict.; Bartlett, Dict. of Americanisms, 309, 310; Webst. Dict.; 10 Am. & Eng. Ency. of Law, 241, 242; *Ross v. Smith*, 1 Barn. & Adol. 911; *Clark v. Phelps*, 4 Cow. 190; Newell, Ejectment, 697, sec. 1; id. 707, sec. 10; id. 715, 716, sec. 20; Wood, Limitations, §§ 257–259; *Price v. Brown*, 101 N. Y. 669; *Ely v. Brown*, 183 Ill. 525; *Roberts v. Baumgarten*, 110 N. Y. 380; *Roe v. Strong*, 119 N. Y. 322; *Jackson v. Woodruff*, 1 Cow. 277; *Jackson v. Schoonmaker*, 2 Johns. 230; *Barr v. Potter*, 57 Ky. 478.

The following opinion was filed January 8, 1901:

MARSHALL, J.    We understand the statement which appears in the record, as to the proof of title upon which plaintiff rested its claim and secured the judgment appealed from, to mean this: A record was exhibited which purported to show that the United States or the state of Wisconsin, most likely the former, prior to 1872, made a patent, in form conveying to private ownership a certain government subdivision of land within and according to the public land survey; that such title as was thus acquired was by mesne conveyances vested in plaintiff before the commencement of this action; and that the premises in controversy are within the boundaries of such government subdivision according to such survey. That proof made out a *prima facie* title.    The case seems to have been tried and decided upon the theory that it was sufficient to entitle plaintiff to recover unless defendants were able to show a better title by adverse possession.

The learned counsel for respondent, evidently assuming that the actual possession of lands submerged by water, necessary to satisfy the requisites of adverse possession so as to gain title in that way, is difficult if not impossible, encouraged defendants' witnesses to make it appear as clearly as possible that when the adverse possession in controversy commenced, and for a long time thereafter reaching up to within about thirteen years of the time of the commencement of the action, the particular land in question was covered by water from three to nine feet deep; that such was its condition when appellants took possession thereof; and that there had been no change in that regard except by artificial filling.

There is evidence tending to show that there was some dry land within the territory over which Muza assumed dominion in 1872. But the indications are that the greater part of such territory was then covered by the waters of Lake Michigan or of an arm of the lake partaking of its character, or by some expanse of water governed by the law relating to the title to the beds of lakes and ponds, and that the premises in question were formerly a part of such submerged land. Now, if such indicated facts are the truth of the matter, the land belongs to the state of Wisconsin regardless of whether the United States or the state has in form transferred it to private ownership. The law in that regard is too well settled to warrant any discussion of it here. This court has been over the whole subject many times in recent years. The title to the beds of all lakes and ponds, and of rivers navigable in fact as well, up to the line of ordinary high-water mark, within the boundaries of the state, became vested in it at the instant of its admission into the Union, in trust to hold the same so as to preserve to the people forever the enjoyment of the waters of such lakes, ponds, and rivers, to the same extent that the public are entitled to enjoy tidal waters at the common law. A patent

from the United States, so far as it purports to cover any of such lands, whether made before the state was admitted into the Union or thereafter, is ineffectual. It has been so repeatedly held. A government patent of land bordering on a lake or pond, regardless of the boundaries thereof according to the government survey, does not convey title to the lands below the line of ordinary high-water mark. The United States never had title, in the Northwest Territory out of which this state was carved, to the beds of lakes, ponds, and navigable rivers, except in trust for public purposes; and its trust in that regard was transferred to the state, and must there continue forever, so far as necessary to the enjoyment thereof by the people of this commonwealth. Whatever concession the state may make without violating the essentials of the trust, it has been held, can properly be made to riparian proprietors. Under that, by long-established judicial policy, which has become a rule of property, a qualified title to submerged lands of rivers navigable in fact has been conceded to the owners of the shores. Otherwise the title to lands under all public waters is in the state, and it is powerless to change it. It cannot transfer such title by grant or otherwise, nor can title thereto be obtained by adverse possession, at least unless such adverse possession shall continue for the term of forty years. Hence we must presume from the evidence that the title to the land in dispute is where the evidence tends to show it is. We should say in passing that the term "qualified title" as above used refers to that interest in the beds of navigable streams which has passed to private ownership according to the uniform holdings of this court,— a full title, subject to the public rights which were incident to the lands forming such beds at the time of the creation of the trust above mentioned. No private ownership has been conceded which displaces or materially affects such public rights. As to them the state has not abdicated and cannot abdicate its trust.

Illinois Steel Co. vs. Bilot and wife.

There is no need of enlarging on this matter. As before indicated, this court has in recent years several times declared the law as here stated, grounding such declaration upon indisputable principles and the law as laid down on the subject by the supreme court of the United States. *Mc-Lennan v. Prentice*, 85 Wis. 427; *Priewe v. Wis. State L. & I. Co.* 93 Wis. 534; *Ne-pee-nauk Club v. Wilson*, 96 Wis. 290; *Willow River Club v. Wade*, 100 Wis. 86; *Pewaukee v. Savoy,* 103 Wis. 271; *Barney v. Keokuk*, 94 U. S. 324; *Railroad Co. v. Schurmeir*, 7 Wall. 272; *Illinois Cent. R. Co. v. Illinois*, 146 U. S. 387; *Yates v. Milwaukee*, 10 Wall. 497.

So plaintiff's *prima facie* title was overcome by the evidence tending to show that the premises in question were naturally a part of the bed of Lake Michigan, or some arm or bay thereof, or some body of water having the incidents of a lake; and the verdict should not have been directed in plaintiff's favor. If the fact be that such is the natural character of the land, plaintiff cannot maintain ejectment therefor in any event, even if it shall establish ownership of the natural shore, though, of course, in such circumstance, it would not be without remedy for any wrong to it not common to the public. *Austin v. Rutland R. Co.* 45 Vt. 215; *Coburn v. Ames*, 52 Cal. 385; *Gray v. Bartlett*, 20 Pick. 186; *Stockham v. Browning*, 18 N. J. Eq. 390.

What has been said regarding plaintiff's title requires a reversal of the judgment in any event, for it can only recover on the strength of its own title, not on the weakness of *Bilot's*. However, it is deemed best to correct some erroneous ideas that seem to have influenced the direction of the verdict as bearing on appellant's claim of title. If it shall finally turn out that the premises in question were not originally a part of the bed of Lake Michigan, nor of any expanse of water partaking of the character of a lake as regards the title to the bed thereof, but were part of the bed of navigable waters of such a character that a qualified title

thereto passed to the owner of the shore as an incident thereof, then they are subject to the law of adverse possession. And if in such circumstances Muza, under whom *Bilot* claims, maintained from 1872 until *Bilot* took possession of the premises a condition which disseised the true owner, and *Bilot* continued that condition so as to cover the full period of twenty years, his title is governed by the principles declared in *Illinois S. Co. v. Budzisz*, 106 Wis. 499, and the settled law on the subject.

It is not true, as seems to have been supposed, that adverse possession of the premises was impossible while they were covered by water. Notwithstanding such condition the true owner may have been disseised, and that was all that was necessary to start the limitation period running. Any act or acts sufficient to destroy the true owner's dominion over the property, whatever its character, is a disseisin, within the meaning of the limitation statute. 3 Washb. Real Prop. *495. Physical exclusion by an inclosure of the property of some kind is by no means necessary; neither are the requisites of sec. 4212, Stats. 1898, essential. *Wilson v. Henry*, 40 Wis. 594; *Lampman v. Van Alstyne*, 94 Wis. 417. It has been held that evidence of the mere taking of seaweed to the exclusion of all others is sufficient proof of disseisin to carry a case to the jury on that subject. *East Hampton v. Kirk*, 84 N. Y. 215. Actual, visible, hostile appropriation of the premises to the exclusion of the true owner in any way satisfies all the requisites of disseisin, and that condition may be created by any means that entirely exclude the true owner from the property. It does not require constant residence of the appropriator on the property. Private interest in submerged land of the character we are discussing, *prima facie* at least, exists only as an incident of title to the bank or shore. He who is in actual possession of that is constructively in possession of everything that is incident thereto. If possession of the former

ripens into title, the title to the latter goes with it. Gould, Waters, § 37, and cases cited in the notes.

Applying the principles last stated to the evidence as to defendants' title, it is easily seen that the case in that respect should have been submitted to the jury even upon the trial court's theory as to plaintiff's title. There was evidence tending to show that for more than twenty years before the commencement of this action the person holding *prima facie* government title had been, in the right now claimed by *Bilot*, disseised thereof. There is evidence tending to show that Muza, from 1872 till *Bilot* commenced the artificial change of the property, exercised such dominion over the same as to prevent any person from enjoying it in any way except by his permission. Such evidence tends to show more than a mere claim of dominion. That clearly would be insufficient. It shows that there were physical acts of prohibition, so that Muza's claim was notorious, recognized, and submitted to, and that such acts were accompanied by actual occupation and enjoyment of the beach or dry land adjoining, if there was any. In the face of such evidence, plaintiff was not, in any phase of the case, entitled to the direction of a verdict, but the cause should have been submitted to the jury under proper instructions.

It is hoped that on the next trial of this case all the facts will be clearly brought out in the light of all the legal principles applicable thereto, and that such principles will be kept clearly in view; also that the precise location of the property in dispute will be shown, so that it can be identified with reference to the original shore line and the present shore line. That there was a failure, upon the trial we have reviewed, in respect to the matters referred to, is most clear. That has rendered it impracticable for us to lay out a definite line for future guidance in the case. The assumption that plaintiff's title was good originally, merely because it came from the government, and the assumption that, merely be-

Illinois Steel Co. vs. Bilot and wife.

cause the land was submerged, it could not be held adversely, and the further assumption that actual possession was necessary independent of actual possession of the shore, all seem to have had influence with the trial court.

*By the Court.*— The judgment of the superior court is reversed, and the cause remanded for a new trial.

BARDEEN, J., took no part.

A motion for a rehearing was duly submitted in this case and was decided March 19, 1901, the following opinion being filed:

MARSHALL, J.   The argument on the motion for a rehearing has received that consideration which the learned counsel for respondent earnestly invoked for it, without our being able to indorse the reasons assigned for changing the judgment entered, though such reasons are urged with such earnestness and confidence that a departure from the usual course in disposing of such matters, by filing an opinion pointing out what appears to be the weakness thereof, seems advisable.

As a preface to what we shall say it seems proper to make a few observations in respect to the right attitude of counsel, so unfortunate as not to have their side of a controversy viewed here as they view it, on the first presentation of their case, in measuring the situation in which the adverse judgment places them and solving the question of whether a further effort here should be made or not.   The situation of counsel at such a time, especially where great interests are involved and the decision disappoints hopes born of a careful study of a subject, is well suited to test to the utmost that power of calm consideration of the reasons and authorities, supposed to lead up to and require the adverse decision, necessary to enable a person to give due weight thereto.

Illinois Steel Co. vs. Bilot and wife.

But, as said on a similar occasion (*Brown v. C. & N. W. R. Co.* 102 Wis. 151), whether counsel stand the test or not, the duty of this court to carefully and dispassionately reconsider a determination of old questions in the light of old and new reasons, and to do the same as to any new point advanced which was overlooked by counsel on the first presentation, uninfluenced by any other consideration than that of a desire to discover and pronounce the law correctly, remains the same. It is hoped and believed that the learned counsel's second argument has received that consideration. Whether such argument indicates that it was presented and guided by the state of mind necessary to properly weigh an adverse decision may best be judged by the reasons advanced to disturb it and the support thereof pointed out for consideration.

The opening pages of counsel's argument are devoted in the main to a personal vindication and a vindication of the trial court, the excuse being kindly made at the start, for the treatment of the case by this court which calls for such vindication, that it was characterized by haste as a result of press of business. Whatever the motive of the learned counsel — and we will not indulge in the idea nor doubt at all but that it was worthy — the intimation that the case did not receive proper consideration here because of press of business, though made and repeated in such a way as to challenge reflection, is one that a person, conscious of the full scope of its meaning, will not make at all unless he desires to say that judicial duty has not been properly performed. We are safe in saying that counsel does not intend to say that. Yet, as it seems, haste, strictly so called, in work so important, is not excusable by pressure of business. It is not understood here that pressure of business is any excuse for a hasty consideration and disposition of the rights of any one. If that supreme virtue, charity, moved counsel to assign the weight of the burden resting *here* as an excuse

Illinois Steel Co. vs. Bilot and wife.

for haste, it should be understood that there is no one *here* who believes that the mantle of such virtue reaches far enough to accomplish counsel's purpose. *Here* is centered the last hope of every party conceiving himself aggrieved in a trial court for the ultimate attainment of justice, and every one *here*, it is believed, is fully conscious of that fact and aims to labor with the deliberation and patience and industry and courage necessary to discover and determine the truth both as to the law and the fact, blind to the effect thereof upon counsel or courts that had first to do with the matter, or the effect upon particular parties, whether high or low, devoting all the time requisite to that end, unconscious, for the time being, of any interfering burden. The learned counsel whose work we now have before us, being thus informed, will of course not ground the reargument of a case hereafter upon any assumption of excusable haste by this court in deciding it at first.

Counsel complain because in the former opinion it was suggested that on the next trial an effort be made to establish all the facts that are material in the light of the legal principles discussed, and that such principles be kept clearly in view from the beginning to the end of the trial; that the particular location of the property in dispute be indicated with reference to the original and present shore line of Lake Michigan. They say much evidence was introduced showing that plaintiff's title was *prima facie* perfect, from the government, and that it was so stated in appellant's bill of exceptions. Why was that not sufficient? we are asked, and why should all the evidence have been put into the record, which would have resulted only in showing what was admitted, that is, that plaintiff's evidence established a *prima facie* title? If there were any doubt that the admonition complained of was proper and advisable in the interests of a speedy and just determination of this litigation, and that the profit that may probably flow from

attention to it is certainly as valuable to respondent as appellant, counsel's course of reasoning above indicated would remove it.  A study of the former opinion seems not to have impressed upon the mind of counsel the fact, as it is, that there was no criticism whatever of respondent's *prima facie* case.  There was no intimation that counsel was not diligent and thorough, nor that the learned trial court did not give due weight to the evidence bearing on that question.   There being no criticism in that respect, there is no need for any vindication of either counsel or the court.   It was proper to leave out of the bill of exceptions the record evidence showing respondent's *prima facie* case and to supply its place by an admission of the fact.   Full credit was given to that admission in the decision rendered.   The difficulty is that the significance of evidence produced by appellant and drawn from his witnesses by the cross-examination pointing to the probable existence of facts inconsistent with the *prima facie* case, was overlooked on the trial, overlooked on the argument in this court, and, if we fully understand now the argument on this motion, the same indications are yet present.   No one will dispute that the paper title from the government *prima facie* showed that respondent was entitled to recover.  But if there was evidence tending to show that the territory included in the government survey and patent, instead of being dry land, was covered by a part of the waters of Lake Michigan, then the trial court, on the motion for the direction of a verdict in plaintiff's favor, was bound to hold that the jury might find that such was the fact and that plaintiff's *prima facie* title was thereby overthrown.   Again, if there was evidence tending to show that the *locus in quo* was appurtenant to the bank of a river which had been adversely possessed so as to take the title thereto from the holder of the paper title, the court, on the motion to direct a verdict, was bound to hold that the jury

might find the facts in defendant's favor, necessary to that result.

Counsel complain that we failed to give them and the court due credit for legal learning, and that we assumed that they did not know that private ownership in the bed of a lake cannot be acquired from the government. As we understand the contention it is this: Respondent's counsel having produced evidence making out a *prima facie* case, there was no need to consider the subject of the disability of a private person to acquire title to the bed of a lake, so it is unjust to counsel to assume, because they paid no attention to that matter, that they were not possessed of all the legal knowledge applicable thereto. Of course there was no purpose in the opinion to reflect on the legal ability of court or counsel. We hold both in the highest esteem; but that cannot militate against speaking of cases as they are presented to us by the record, however eminent counsel or court may be or who may be connected therewith. Probably there has not yet been counsel so eminent or court so learned but that mistakes have occurred, and such situation will undoubtedly continue. That is clearly demonstrated by the following.

Of course counsel fully understand that a person cannot acquire private ownership in the bed of a lake, yet they insist that when a mere paper title is made to what appears to be dry land by the government plat and the government patent, such appearances are conclusive on the question of title, overlooking the fact that it has been decided over and over again, by this and other courts, that it is the physical fact of whether patented land is in a lake or not that governs. If it is shown upon the government plat to be land and it is sold as such, but in fact it is within the boundaries of a lake, the paper purporting to convey title thereto is a nullity. That is elementary. A large number of cases are cited to it in the former opinion. We will not add to them

here. So if we acquit counsel for not bearing in mind that a person cannot become the owner of the bed of a lake, they make it more probable than before that on the former trial it was not borne in mind that a mere paper title to territory that is in fact a part of a lake, even if the pictured representation thereof made in the government land-office shows it to be dry land, must fall before the physical situation that it is in a lake.

The subject above discussed has been sufficiently treated, but counsel may think their argument on the motion for a rehearing has not received consideration in detail if we omit to refer to their suggestion that we could have obtained considerable light on their position by attention to the first forty-five pages of their printed argument, which, it is assumed by counsel, we did not study. That assumption is right. Counsel's argument covered fifty-two pages. The first forty-four related to matters not covered by the assignments of error. That came about by the preparation of respondent's brief without the benefit of appellants' brief. As the case was finally submitted, all of the argument of respondent's counsel, except about seven pages, was entirely eliminated from the case, and we were no more called upon to examine it than to examine their brief in some other case. But if we had taken the time to read the whole argument, the only influence it could have had, if any, would have been to confirm our impressions that the significance of the physical condition of the premises in question, in respect to whether covered by the waters of Lake Michigan or by water partaking of the characteristics of a lake as to the title to the bed thereof, or covered by water adjacent to a shore adversely held, was overlooked.

We are appealed to by counsel to draw on all the resources which we can properly take judicial notice of, notwithstanding omissions to bring the same to our attention. The answer to that is that the actual, physical situation of

the premises in question cannot be controlled by maps or plats. If what was the bed of the lake has been platted as dry land, the platting does not affect the title. If, as before indicated, land has been pictured on government plats as land, which was in fact in a lake, the fact governs, not the mapping of the territory by the government.

It does not seem that we are called upon to discuss the evidence which we said raised the question of whether the premises in dispute were a part of the bed of a lake. We did not pretend to give the evidence of witnesses word for word, but to state the effect thereof,— not the conclusive effect by any means, but the effect as a court must view it in determining whether the direction of the verdict was proper. We were bound, as of course the trial court was, to give appellant the benefit of the most favorable inferences that could reasonably be drawn from the evidence. All the facts which such inferences pointed to, we were bound to consider as established and verities in the case, because the jury would have had a right to so decide had they been permitted to do so.

We will make a few references to the testimony at this time for the purpose of supporting the views expressed above. Counsel say this court said that Jones testified that the entire territory was covered with water in 1855; that if by "entire territory" Jones Island is meant, the court entirely misapprehended the witness's testimony. It is evident counsel views the evidence from the standpoint of the favorable inferences it will bear for respondent, while we view it in the light of the most favorable inferences it will reasonably bear for appellant. There is the trouble. The witness said: "The condition of the island in 1855, it was pretty nearly a marsh. The mill was very small and it occupied very near the whole of it. The condition of the island compared with what it was in 1855, it is not hardly the same place. There is much more land now than there was then. In 1855 sail-

boats went by way of the cut right over the center of the island. The soil on either side of that cut was all sand, not marsh in through the cut. That was washed in there, but marsh all around it though pretty near. When the wind was off the lake the marsh would be submerged in water. There was some water on there all the time, but it would rise and fall." Now it seems that a fair inference from that evidence is that in 1855 substantially all of the island, except a small place large enough to locate a mill upon, was covered by water. Sometimes it was shallow, so as to have the appearance of a marsh or swamp, and at other times it was so submerged as to hide those indications. The water raised and lowered with the lake, said the witness. A witness by the name of Kunka testified that in 1872 he went onto the island and there was marsh grass there; that the water would rise and fall; that the water was from two to three feet deep; that there was marsh grass growing there. In its natural state, unaffected by any disturbing causes, the water was flowing. Sometimes the water would be still and other times not. "The time I first came there, there was no solid ground on the island whatever." This question was asked the witness: "When you came there how much water was there on the average, spread over the island?" to which he answered, "It was in places seven feet, eight feet, nine feet, and ten feet, the shallowest point about four feet and probably five feet. It was that way all over the island." Again the witness said: "It is true that those people who are living on Jones Island when they came there filled up a part and built on it. The business of all living on the island when I went there was fishing, and in order to get to their houses they would have to go in boats." There are other indications in the evidence, too numerous to mention in view of what was said in the former opinion, that what the witness called a marsh or swamp was covered with water, not deep enough, however, when the lake

was at rest, so but that vegetation which commonly grows in shallow water appeared on and above the surface. Muza called the territory where *Bilot's* house was located a swamp, and yet the water was said to be from three to six feet deep according to the condition of the water in the lake. *Bilot* said he floated the material to his place to fill with, and went to and from it in a boat. Muza said that when he went to the island it was all swamp, marsh, mud, and water as deep as over a man's head; that in the locality of *Bilot's* place the water was sometimes still and sometimes flowing; that it depended upon the lake; that most of the time the water was still. The evidence is replete with indications that the water on the marsh, so called, was lake water, not river water; that it had very little if any movement indicating a river, and that the indications of the characteristics of a lake were sufficient to warrant a jury, under proper instructions, in finding that the territory in question was formerly lake bed.

From the foregoing it seems that all said in the former opinion as to the evidence presenting questions of fact that should have been solved by a jury under proper instructions, is fully sustained by the record. Was the territory in question originally a part of the bed of a lake or pond, or part of the bed of a river? The mere fact that the water was very shallow, so that marsh grass appeared above the surface, that it was called a marsh, and that the water was not deep enough to admit of navigation, or that the surface was not at all times wholly submerged, does not preclude its being in fact a lake. All those conditions existed in *Nepee-nauk Club v. Wilson*, 96 Wis. 290, yet it was held there that the territory in dispute was a lake. Size or depth of a body of water, it was there said, does not solve the question of whether it is a lake or river. If the land in question was inside of the natural shore of Lake Michigan, or of any body of water not a river, so that water did not merely beat upon it as a shore, but covered it, or if the land was covered by

water, not a part of Lake Michigan, yet not a part of a river, manifestly plaintiff never obtained title thereto through or under the patent from the government.

Complaint is made because, in the statement of facts upon which the former opinion was based, it was said that Truher pretended to exercise dominion over the entire territory, and prevented any person from locating thereon without his permission. Notwithstanding the confident assertion of counsel that there is no such evidence in the record, either in a literal sense or within the range of reasonable inferences, we still think that, on the whole, what was stated and is so criticised is a fair inference from the testimony of Muza. Certainly Truher, according to Muza's evidence, pretended to own the island. He was living there when Muza came upon the scene. He asserted the right of dominion over the island. He pretended to sell and deliver possession thereof to Muza, asserting at the time that no one could take it from him but Lake Michigan. The difficulty seems to be, as before indicated, that we look at the evidence in the most favorable light it will reasonably admit for appellant, while counsel for respondent view it from the standpoint of the most reasonable inference to be drawn therefrom in its favor. That the latter is not the correct method of testing the record to determine whether the direction of the verdict was proper, need not even be stated.

A few words now in respect to what counsel say on the subject of adverse possession, and we are done. If there is anything in the former opinion indicating that there can be constructive adverse possession of land so as to disseise the true owner, without its being based on a written instrument, and actual possession of part of the premises included in it, we do not know where it is. We said that physical exclusion of the true owner is not necessary to adverse possession, nor is compliance with sec. 4212, Stats. 1898. That is certainly true, but it is also true that there must be an

Illinois Steel Co. vs. Bilot and wife.

inclosure or usual cultivation or improvement of the property adversely claimed, so as to indicate the boundaries of the adverse claim, and that such claim cannot be extended beyond the actual occupancy. That is the common-law rule and the rule of the statutes as well. Secs. 4213, 4214, Stats. 1898. It is also true 'that. all presumptions are in favor of the true owner, and that such presumptions must prevail until overcome by clear proof of continuous disseisin of the true owner for the complete statutory period. But such presumptions do not reach further. The statutory period being completed and satisfied by clear proof of the actual occupancy required, the presumption is turned in favor of the adverse occupant, and it does not make any difference whether the adverse holding was under a written instrument or not. True, there is a distinction between adverse possession under sec. 4211 and such possession under secs. 4213 and 4214. But when that distinction is satisfied, sec. 4210, Stats. 1898, rules the situation. That provides that in every action to recover real property, or the possession thereof, the person establishing the legal title shall be presumed to have been seised of the property within the time required by law, and the occupation thereof by another deemed subordinate thereto unless it appears *that the premises have been actually possessed for the full period necessary to the acquisition of title in that way under some other provision of the statutes.* Disseisin under sec. 4212, of an entire tract of land, may be accomplished by actual possession of a part of it. Such possession will carry, by construction, possession of the entire tract described in the written instrument of conveyance or the judgment forming the basis of the claim of title. Disseisin under secs. 4213 and 4214 can only be accomplished by and to the extent of actual occupancy, the boundaries thereof being indicated by a substantial inclosure of some kind, or cultivation or improvement *in the usual way.* No particular kind of inclosure is

requisite. It may be artificial in part and natural in part. Nor is any particular kind of an improvement required, so long as it satisfies what is usual under the circumstances and indicates clearly the boundaries of the adverse occupancy. That is the definite, positive, and notorious *pedis possessio* of the common law, and of the statute (sec. 4214, Stats. 1898) as well,— the actual possession characterized by an inclosure, or by such use as is usual for such land. There is no difference between the statutory requisites of such adverse possession and the common-law rule. The former is but a fair declaration of the latter. If one relies upon an inclosure to support a claim of adverse possession, an artificial inclosure is not necessary. The boundaries may be artificial in part and natural in part if the circumstances are such as to clearly indicate that the inclosure, partly artificial and partly natural, marks the boundaries of the adverse occupancy. *Becker v. Van Valkenburgh*, 29 Barb. 319; *East Hampton v. Kirk*, 84 N. Y. 215; Tyler, Ejectment, 888. If improvement of the premises is relied upon to mark the boundaries of the adverse possession, it need not necessarily be an actual improvement of the property in value, as the learned counsel for respondent seem to indicate. The term "improvement in the usual way" as used in the statute means put to the exclusive use of the occupant, as the true owner might in the usual course of events. That use may be, as it often is, one that adds nothing to the value of the premises. It may even destroy the natural and actual value, as, for instance, a highway may be acquired by twenty years' uninterrupted adverse use. No one would claim that it would improve the property in the particular lexiconic sense of the word which counsel seem to apply to it as used in the statute. The right to flow land may be acquired by twenty years' continuous, hostile use thereof for that purpose, though the result be to destroy the value thereof. Putting land to the exclusive use of the claimant for collec-

tion of seaweed is held to be evidence of adverse use, and a usual improvement of land adapted to that purpose. So held in New York, where the statutes are the same as ours. *East Hampton v. Kirk, supra; Clancey v. Houdlette*, 39 Me. 451. In *Archibald v. N. Y. C. & H. R. R. Co.* 157 N. Y. 576, the term "improvement" was treated as synonymous with "use," the court saying: "It cannot be said as a matter of law upon the evidence in the record that any one was in the actual possession or occupation of the parcel during the period of twenty years prior to the commencement of the action. The land was not inclosed or cultivated or *put to the exclusive use of any one.*"

It must be borne in mind that the distinction between adverse possession under color of title and such possession without that color, is this: In the former the actual possession, by presumption of law, is constructively extended to the limits defined in the paper conveyance or judgment which gives color to the claim of title; while in the latter, adverse possession is bounded by the actual adverse occupancy. The essential elements of actual adverse possession are substantially the same where there is color of title and where there is not, though on the question of fact, of whether a possession has the essentials of adverse character requisite to disseise the true owner and start the statute of limitations running against him, particularly the element charging him with notice of the hostile invasion of his right, more persuasive evidence is required in the latter case than in the former. Sedgwick & W. Trial of Title to Land (2d ed.), § 731. So the use, by appellants' counsel and this court, of judicial authorities where the adverse claim was based on color of title in support of the proposition that the evidence in this case required the facts involved to be found by the jury under proper instructions, was legitimate. It shows no disregard of the statutes (secs. 4213, 4214, Stats. 1898), but is in perfect harmony therewith. The actual adverse oc-

cupancy that will draw to it, as a matter of law, constructive occupancy under sec. 4211, is in law and in fact within the scope of the term " protected by a substantial inclosure," or " usually cultivated or improved," used in sec. 4214. Whether such occupancy exists in any given case, if to be determined from evidence susceptible of reasonable conflicting inferences, is for the jury to say. The learned trial court, and counsel for respondent as well, recognized that, but, as it seems, it was not correctly applied, because the bearing which the nature of the premises in controversy has in determining the truth, was overlooked, or there was a misunderstanding of the meaning of the term " usually improved " as used in sec. 4214; or due consideration was not given to the fact that reasonable means of knowledge of an adverse claim, and the extent of it, is as effective, in the law governing the subject under discussion, as actual knowledge. What will constitute adverse possession of land not susceptible of being devoted to any profitable use, might not, necessarily, of agricultural land or any other susceptible of being so devoted. What would be effective for that purpose as to lands wholly or partially overflowed by water, might not as to a building lot in a city. What would satisfy such purpose in respect to a marsh or swamp, not usually put by the owner to any other use than that of a hunting and fishing ground, might not as to premises of any other character. The governing questions of law, regardless of the character of the premises, are the same in every case, but the question of fact may be presented by evidence in such a great variety of ways, according to the circumstances of each particular case, that usually there is room for conflicting inferences, requiring the verdict of a jury as to where the truth lies. The true doctrine, recognized by all courts and text writers, was declared by the United States supreme court in *Ewing's Lessee v. Burnet*, 11 Pet. 41, 52, speaking by Mr. Justice BALDWIN, as follows:

"To constitute an adverse possession there need not be a fence, building or other improvement, and it suffices for the purpose that visible and notorious acts of ownership are exercised over the premises in controversy for the time limited by statute. So much depends upon the nature and situation of the property, the uses to which it can be applied or to which the owner or claimant may choose to apply it, that it is difficult to lay down any precise rule in all cases. But it may safely be said that where acts of ownership have been done upon the land, which from their nature indicate a notorious claim of property in it, and are continued sufficiently long with the knowledge of an adverse claimant without interruption or an adverse entry by him; such acts are evidence of an ouster of a former owner and an actual adverse possession against him, provided the jury shall think that the property was not susceptible of a more strict or definite possession than had been so taken and held. Neither actual occupation, cultivation nor residence are necessary where the property is so situated as not to admit of any permanent useful improvement, and the continued claim of the party has been evidenced by public acts of ownership such as he would exercise over property which he claimed in his own right and he would not exercise over property which he did not claim."

We should remark in passing, lest the above declaration appear to conflict with sec. 4214, that the facts that gave rise thereto indicate clearly that the term "improvement" was used in the restricted sense of some profitable use or physical change increasing the value of the premises, instead of in the broad sense of devoted to any use for which the premises are adapted, the sense in which the term "usually improved" is used in our statute; and that the words "actual occupation" were used in the restricted sense of appropriated by the location of some structure thereon, instead of the broad sense of any use constituting actual possession and appropriation for any purpose the land is adapted to, the sense in which the term "occupied" is used in sec. 4213 as construed by sec. 4214.

In the instant case there is some evidence that the prem-

ises in controversy were subjected for the requisite length
of time to the use which they were best adapted to, and a
usual use, and that the acts in that regard were notorious.
How, then, can we say as a matter of law that the essentials
of adverse possession did not characterize Muza's conduct?
It is not difficult to say generally what, as a matter of law,
constitutes adverse possession; but what will evidence the
necessary facts, so as to warrant saying that they exist in
any given case, is quite another matter. The question of
adverse possession is one "compounded of law and fact, and
every case in which it is involved must be determined by
its own circumstances. What is adverse possession is one
thing in a populous country, and another thing in a sparsely
settled one, and still a different thing in a city or village."
*Draper v. Shoot,* 25 Mo. 197. In *Sauers v. Giddings,* 90 Mich.
50, there was no color of title. The adverse claimant used
the premises yearly as a hay meadow and for grazing pur-
poses, and he planted some trees thereon. On such facts it
was held that, whether they indicated the legal requisites
of adverse possession as a fact, was a jury question. In *Clark
v. Potter,* 32 Ohio St. 64, discussing the same subject it was
said:

"As the character of the possession depends on the nature
and situation of the property, and the use to which it can
be applied or to which the owner may choose to apply it, it
is evident that resort must be had to the usual and ordinary
conduct of owners of such land to determine if it is suffi-
cient. If the possession comports with ordinary manage-
ment of similar lands by their owners, it furnishes sufficient
evidence of adverse possession."

A large number of cases might be cited to support the
views above expressed. It is believed that they are so ele-
mentary that further reference to authorities is unnecessary.
They lead to this: Occupancy of land necessary to adverse
possession under sec. 4213, Stats. 1898, need only be such
actual possession as the subject of it is adapted to under the

circumstances of the particular case and such as is reasonably sufficient to attract the attention of the true owner and put him on inquiry as to the nature and extent of the invasion of his rights. If an inclosure of itself is relied upon to establish occupancy it must be of a substantial character in the sense of being appropriate and effective to reasonably fit the premises for some use to which they are adapted. If an improvement of the premises is relied upon, any actual visible use to which similar premises are usually devoted may be sufficient, whether the result be to increase or decrease the same in value, or destroy the natural value entirely. Occupancy for a burial lot is as effective as occupancy for the purposes of a costly structure. An inclosure having no purpose of physical exclusion of outside interferences — a mere furrow turned with a plow around the land (*Sage v. Morosick*, 69 Minn. 167), or a line marked by cutting away the brush (*Worthley v. Burbanks*, 146 Ind. 534), or a fence opened so as to admit outside disturbers (*Sauers v. Giddings*, 90 Mich. 50),— may be sufficient under the circumstances to indicate, as a matter of fact, the boundaries of the adverse claim; and such boundaries may be evidenced satisfactorily to a jury by any means reasonably calculated to clearly suggest the same or suggest inquiry in regard thereto that would probably readily and clearly lead to a discovery of the truth. It is not necessary that such indications be sufficient to evidence constantly, by mere observation and without inquiry, the precise extent of an apparent hostile occupancy. If the claimant "raises his flag and keeps it up," so to speak, sufficiently to attract the attention of the true owner to the situation, in view of the circumstances of the invasion, as a hostile claim of title, knowledge of such owner may be presumed as a fact, on the general principle that what a person ought to know under the circumstances may be held to be within his knowledge regardless of the actual fact. Sedgwick & W.

Trial of Title to Land, § 735; *Lampman v. Van Alstyne*, 94 Wis. 417. In discussing this subject in *Cobb v. Davenport*, 32 N. J. Law, 369, it was in effect said that the title to premises may be obtained by continuous, exclusive, notorious, hostile appropriation thereof for the mere purpose of hunting, hawking, or fishing.

What has been said, either by direct reference or general treatment, answers the various reasons given by respondent's counsel why there should be a rehearing in this case. The difficulties with sustaining the conclusion reached by the trial court seem the same now as before. We think there was error in overlooking the fact that on the evidence defendants' right to recover did not rest wholly on the defense of adverse possession; that there was error in assuming that there was an entire absence of evidence tending to establish some of the necessary elements of adverse possession; that due consideration was not given to the character of the premises in determining whether such facts might reasonably be found by the jury to exist. Further, we think that it was overlooked that it was not essential to the defense of adverse possession to produce evidence tending to show that Muza was adversely possessed of the whole of Jones Island, or to show the exact boundaries of his adverse possession. It was sufficient to carry the case to the jury on the point under discussion, to produce evidence tending to show that he, for the requisite length of time, adversely appropriated territory, including the *locus in quo*, to a use to which it was adapted, under such circumstances that the owner, as a reasonably prudent person, ought to have been apprised of it. The question is, Can any sensible person reasonably say from the evidence that Muza's conduct was characterized by all the elements necessary to adverse possession of the premises in question? He testified, without objection, that he took possession of such premises in 1872 and retained such possession till he surrendered the same to *Bilot;* that

no one disturbed his right; that he *made no use of the land* because it was marsh. In saying he made no use of the land he evidently meant that he made no use thereof as dry land; for he said almost in the same connection that he used the premises in his business as a fisherman and trapper, as he did all the territory claimed by him. Further, he said he prohibited any person, other than those who lived on the island, from entering the territory, including *Bilot's* location. Once, in speaking of the use made of the premises he said "we" as if the use by him and the other settlers was in common. At another he used the pronoun "I" and indicated that he exercised authority, as an owner naturally would, to say who should and who should not enjoy the premises for fishing and trapping. Here, in the mind of the trial court, was the weakest point in the evidence. We can indorse that. It must be admitted that the truth of the matter would be very hard for any one to determine, but that does not justify the direction of the verdict. In view of the nature of the premises, the fact that they were in the immediate vicinity of a populous district where a hostile interference therewith would be quite likely to attract attention and become notorious, that there was some evidence that the premises were devoted to the very purpose for which they were best adapted, hunting and fishing — not occasionally, but as such business is ordinarily carried on,— some evidence that Muza assumed to have rightful dominion over the premises; that he resided thereon in the vicinity of the particular lot in question; that he enforced his claim of title as an actual owner would, by prohibiting any person from entering the territory to use the same for any purpose; that no other person pretended to exercise any such authority; that his claim of title was submitted to by everybody; that every person, from 1872 down till *Bilot* secured his location, who settled on the territory adversely claimed, did so by acknowledging Muza's title, by obtaining of him the

right to locate, and taking the particular parcel designated by him,— could a jury, under proper instructions, reasonably say that the elements of adverse possession were all established? Counsel for respondent have given us no reason which, when analyzed and tested by the principles we have discussed, seems to justify us in answering that question any differently than we did before.

*By the Court.*— The motion for a rehearing is denied.