ANGELO and others, Appellants, vs. RAILROAD COMMISSION OF WISCONSIN, Respondent.

*December 7, 1927—January 10, 1928.*

*Navigable waters: Title to bed of navigable lake: State granting permission to private persons to take marl from lake bed: Payment of money to state as prerequisite of permission: Rights of riparian owners: Rights of state in lake bed: Authority of railroad commission.*

1. Under sub. (5), sec. 31.02, Stats. (created by ch. 410, Laws of 1923), the determination by the railroad commission of the amount of compensation to be paid to the state is a prerequisite in any contract the railroad commission may make for the removal of marl from the bed of any navigable lake; and the clause in the statute that such contracts shall have

conditions such as may be necessary for the protection "of the public interests and the interests of the state of Wisconsin" in nowise modifies the absolute condition requiring a money compensation.    pp. 547, 548.

2. The words "compensation to be paid," as used in said statute, given their primary and ordinary significance, clearly connote the use of money; and the possible lowering of the price of the material taken from the lake to the public is not within a proper construction of those words.    p. 548.

3. Title to the beds of navigable rivers and streams is in the riparian owners, subject to the public rights incident to navigation; and such title carries with it the right to separately sell title to the submerged land of the river bed.    p. 549.

4. The fact that the United States patent in terms included land under the waters of a navigable lake as though not submerged does not affect the right of the state in contracting for the removal of material thereunder, because such a grant is presumably subject to the right of the state as to waters and riparian rights.    p. 550.

5. Sec. 3, art. IX, Const., declaring the people of the state to possess the ultimate property in all lands within the jurisdiction of the state, gave the state the right to determine all matters concerning the title to lands covered by navigable waters, subject only to the paramount authority of the federal government in matters concerning navigation as a part or means of interstate commerce and of its proper disposal by the United States prior to statehood.    p. 550.

6. So, also, the declaration of sec. 1, art. IX, Const., that the navigable waters leading into the Mississippi and the St. Lawrence shall be common highways and forever free, copied from the Ordinance of 1787, is effective as against the state, irrespective of any question as to the power of the Continental Congress to so provide by the Ordinance of 1787.    p. 551.

7. The question whether a body of water is "navigable" is, in the absence of express legislative declaration, one of fact.    p. 552.

8. The soil under a navigable lake, as distinguished from the body of water resting thereon, is "land" within the boundaries of the state; and since title to all land, submerged or not, must rest somewhere, subject only to the declared trust of the constitution as to navigation, title thereto is in the state as sovereign.    p. 552.

9. The fact that title to land submerged by public waters may by accretion or reliction slowly pass from the state to the riparian owner does not change the rule that title to the bed of navigable waters is in the state.    p. 556.

10. It was within the power of the legislature to enact ch. 410 of the Laws of 1923, empowering the railroad commission to make contracts for the removal of any material from the bed of a navigable lake for compensation to be paid to the state; and such act does not invade the rights of riparian property owners either under the federal or the state constitution. p. 558.

11. Such statute is not to be construed as intending to give a contractor thereunder a license to invade or injure the rights or privileges of riparian owners, or to take away from such owners or others injured in the carrying on of such work the usual remedies for wrongs. p. 558.

APPEAL from a judgment of the circuit court for Dane county: A. G. ZIMMERMAN, Circuit Judge. *Reversed.*

Appellants, property owners on Lime lake, Portage county, seek to enjoin the defendant *Railroad Commission* from acting under sec. 31.02 (5), Stats. (ch. 410, Laws of 1923), in conferring authority upon certain persons to take marl from the bed of such lake.

This lake covers some fifty-nine acres, and from recitals in the record has been used for boating, hunting, and fishing. It was not meandered in the United States government survey, though its outlines were thereon sketched. The patents from the United States conveyed as land the entire area. There is no showing whether it is connected with waters flowing into Lake Michigan or the Mississippi, and the county map indicates that it has no apparent outlet.

November 5, 1924, the *Railroad Commission,* after a hearing at which plaintiffs appeared, by order granted to one Somers *et al.,* upon their application, leave to dredge and take marl from the bed of said lake, upon conditions that said marl should be sold at not more than one dollar per cubic yard; that such leave was not exclusive; was but for five years; the *Commission* reserving full control over the manner in which such marl may be taken and distributed and the price thereof and over all conditions of such lease. It provided that "No compensation shall be paid to or re-

ceived by the state of Wisconsin under this agreement." No provision for compensation to plaintiffs or any riparian owners was made. It appears from the recitals in the application that the necessary equipment costs about $800 and the average cost for such removal is seventy to eighty cents per cubic yard.

The trial court affirmed in all things the said order of the defendant *Railroad Commission* and directed dismissal of the complaint.

From such judgment plaintiffs appeal.

For the appellants there was a brief by *Goggins, Brazeau & Graves* of Wisconsin Rapids and *Buchanan Johnson* of Plainfield, and oral argument by *Mr. Theo. W. Brazeau* and *Mr. Johnson.*

For the respondent there was a brief by the *Attorney General* and *Suel O. Arnold,* assistant attorney general, and oral argument by *Mr. Arnold* and *Mr. Adolph Kanneberg* of Madison.

A brief was also filed by *Herbert C. Hirschboeck* of Milwaukee, as *amicus curiæ.*

ESCHWEILER, J.    Appellants below, riparian owners on Lime lake, challenge, as in violation of rights claimed to be secured to them under the federal and Wisconsin constitutions, the act of the *Railroad Commission* in granting power and authority to certain third persons to enter upon such a lake or body of water and remove marl from the bed thereof, to the commercial gain of such third persons and over the objections of plaintiff, and without compensation to them.

The main question upon which the parties stand or fall in this case is whether the legislature was inhibited by constitutional provisions from enacting a statute created by ch. 410 of the Laws of 1923, which, referring to the *Railroad Commission,* reads:

"31.02 (5) The commission, whenever consistent with public rights, is authorized and empowered to make contracts

for the removal of any material from the bed of any navigable lake, to fix and determine the compensation to be paid to the state of Wisconsin for material so removed, and to enter into contracts, on behalf of the state of Wisconsin, for the lease or sale of such material, with such conditions as may be necessary for the protection of the public interests and the interests of the state of Wisconsin, provided that no such contract shall be made to continue for a longer period than five years."

We shall determine this important question, involving as it does such a new and far-reaching public policy, now, even though the judgment below must be reversed and the action of the *Railroad Commission* set aside because of a very plain failure on its part to comply with the direct mandate and an important condition of the statute.

Assuming the validity of this law, nevertheless the legislature has plainly declared therein that its administrative body, the *Railroad Commission,* though authorized and empowered to make contracts in the interest of the state, shall, in making such contracts for the removal of material from the bed of any navigable lake and as a part thereof, "fix and determine the compensation to be paid to the state of Wisconsin for material so removed." Such provision is a prerequisite in any contract that the *Commission* is authorized to make.

The words used, *"compensation* to be *paid,"* should be given their primary and ordinary significance and as used on such occasions. The word "compensation" often occurs in our constitution and has been held to be synonymous with "salary" (*Milwaukee County v. Halsey,* 149 Wis. 82, 86, 87, 136 N. W. 139) ; and this would certainly mean money; and when in sec. 13, art. I, Const., it is required that "just compensation" shall be given for private property taken for public use, it means, of course, money. The word "pay" primarily and ordinarily means the use of money (*Krahn v. Goodrich,* 164 Wis. 600, 610, 160 N. W. 1072), and especially so when used in connection with an obliga-

tion owing to the government, as is pointed out in *Oneida County v. Tibbits,* 125 Wis. 9, 12, 102 N. W. 897, 899. Clearly, therefore, this above quoted phrase connotes the idea of the use of money.

The further clause in the law providing that such contracts for lease or sale shall have conditions such as may be necessary for the protection of the public interests and "the interests of the state of Wisconsin," in no wise lessens or detracts from the absolute condition requiring money compensation to be paid.

The possible lowering of the price for such material to the people of the state at large or to some particular class is surely not what is meant as the "compensation to be *paid* to the state of Wisconsin for material so removed." The evident tenor of the statute is that the state is disposing of that which is of value and upon which a price or money value to it can be placed, for evidently such material would not be sought in commercial ventures such as here presented unless it be of value in dollars and cents; and that being so, a reasonable proportion thereof must be paid to the state, otherwise such contracts, leases, or privileges are not within the power of the *Commission* to grant.

The legislature evidently did not itself intend to give away, without a direct, reasonable, and substantial compensation to itself, much less to authorize such an administrative body to give away, by conferring on private persons a privilege to dispose of, for their own profit only, the natural resources and property of the state and with no return therefrom to the state. As illustrated in this case, the estimated cost to the lessees is seventy to eighty cents, and the authorized sale price to the public is up to one dollar per cubic yard.

Whether the state itself could make such gifts is not now before us; very plainly it did not here attempt so to do, and therefore there is no power of discretionary generosity vested in the *Commission.*

And as so construed, sec. 31.02 (5), *supra,* now presents

questions as to the nature of title to the bed of navigable lakes; in whom is such title vested; and how far may the title holder make a matter of bargain and sale of the material therein and thereunder.

In disposing of this question we shall treat only of the subject of the bed or the soil under navigable lakes as separate, apart, and distinguishable from the same subject matter concerning navigable rivers and streams, the statute here clearly limiting its scope to the navigable lakes and therefore in no wise presenting any issue as to the ownership of the beds of navigable rivers and streams, title to the center of which has, from an early day and consistently since, been declared, in this state, to be in riparian owners, subject to the public rights incident to navigation. *Jones v. Pettibone,* 2 Wis. 308; *Wisconsin River Imp. Co. v. Lyons,* 30 Wis. 61; *Reysen v. Roate,* 92 Wis. 543, 544, 66 N. W. 599; *State v. Sutherland,* 166 Wis. 511, 521 (166 N. W. 14), and cases there cited at p. 522. This rule carries with it the right to separately sell title to the submerged land of the river bed, as was upheld in *Bright v. Superior,* 163 Wis. 1, 11, 13, 156 N. W. 600. The general doctrine in Illinois is the same, *Tempel v. U. S.* 248 U. S. 121, 129, 39 Sup. Ct. 56; in Michigan, *Collins v. Gerhardt,* 237 Mich. 38, 211 N. W. 115; and in Mississippi, where the riparian owner on the Mississippi river may enjoin the dredging of gravel therefrom, though he may not take such material without permission of the War Department. *Archer v. Greenville S. & G. Co.* 233 U. S. 60, 34 Sup. Ct. 567. See, also, note in 23 A. L. R. 757. In Iowa, for instance, the opposite rule prevails. *Marshall Dental Mfg. Co. v. Iowa,* 226 U. S. 460, 23 Sup. Ct. 168.

We shall consider it also as though such a lake, having no apparent connection with the waters of the Mississippi or the St. Lawrence, but being within the statutory definition, *infra,* of navigable waters of the state, is subject to the same trust as that proclaimed in sec. 1, art. IX, as quoted *infra.*

Whether such a body of water as Lime lake appears to be in the record here should be considered differently in any application of the holding now made upon the main and broad question presented under said sec. 31.02 (5), Stats., and here argued by the parties, is a question not raised by the parties in the court below nor here, nor do we pass upon it.

That the patent from the United States in terms included the land under this body of water as though it were not submerged does not affect the situation (*Mendota Club v. Anderson,* 101 Wis. 479, 492, 78 N. W. 185; *Illinois S. Co. v. Bilot,* 109 Wis. 418, 426, 84 N. W. 855, 85 N. W. 402), because such grants are presumably subject to the rule of the state as to waters and riparian rights. *Brewer-Elliott O. & G. Co. v. U. S.* 260 U. S. 77, 89, 43 Sup. Ct. 60.

Our constitution declares, sec. 3, art. IX:

"The people of the state, in their right of sovereignty, are declared to possess the ultimate property in and to all lands within the jurisdiction of the state; and all lands the title to which shall fail from a defect of heirs shall revert to or escheat to the people."

And by sec. 1 of the same article:

"The navigable waters leading into the Mississippi and St. Lawrence . . . shall be common highways and forever free, as well to the inhabitants of the state as to the citizens of the United States, *without any tax, impost* or *duty* therefor."

The first provision above quoted is an explicit assertion of a fundamental attribute of state sovereignty. Under such power as sovereign the state had, at the moment of its creation, the right to determine all matters concerning the title to lands covered by navigable waters, subject only to the paramount authority of the federal government, in matters concerning navigation as a part or means of interstate commerce and of its proper disposal by the United States prior to statehood. *U. S. v. Holt State Bank,* 270

U. S. 49, 54, 46 Sup. Ct. 197; *Seattle v. Oregon & W. R. Co.* 255 U. S. 56, 63, 64, 41 Sup. Ct. 237; *Appleby v. New York City,* 271 U. S. 364, 46 Sup. Ct. 569; *Massachusetts v. New York,* 271 U. S. 65, 86, 89, 46 Sup. Ct. 357; *Fox River P. Co. v. Railroad Comm.* 274 U. S. 651, 47 Sup. Ct. 669, affirming 189 Wis. 626, 208 N. W. 266; *U. S. v. Chandler-Dunbar W. P. Co.* 229 U. S. 53, 60, 63, 33 Sup. Ct. 667; *Scott v. Lattig,* 227 U. S. 229, 243, 33 Sup. Ct. 242; *Milwaukee v. State,* 193 Wis. 423, 214 N. W. 820.

The second above quoted provision, as to its navigable waters, was copied almost verbatim from the Ordinance of 1787. What power was then in the Continental Congress to so provide is now immaterial; this state solemnly assumed such trust and tied its own sovereign hands in that regard by its self-imposed constitution, and has always recognized such as an absolute duty and obligation. *Diana S. Club v. Husting,* 156 Wis. 261, 267, 145 N. W. 816; *In re Crawford County L. & D. Dist.* 182 Wis. 404, 408, 196 N. W. 874; *Wis. T., L., H. & P. Co. v. Green Bay & M. C. Co.* 188 Wis. 54, 65, 205 N. W. 551.

That there is the substantial difference between rivers and streams on the one hand and lakes on the other on the question of ownership to the soil covered by such waters as indicated above, has been plainly recognized by legislative action as well as by the judicial decisions *supra.*

As early as ch. 72, Laws of 1853, repeated in ch. 41, R. S. 1858, now appearing in substance as sec. 30.01 (2), (3), Stats., it was declared that meandered rivers and streams, and rivers, streams, sloughs, bayous, and marsh outlets, navigable in fact for any purpose, are declared navigable to the extent that they cannot be obstructed without legislative consent, and that the boundaries of lands adjoining waters and the rights of the state and individuals in respect to all such lands and water shall be in conformity to the common law.

Apparently not until ch. 328, Laws of 1895, were lakes

as such so dealt with, and then it was declared that all meandered *lakes*, navigable in fact, or so declared to be by federal survey, are navigable, and public waters, and all persons shall have the same rights thereon and thereto as in and to all other navigable or public waters within the state, and with a proviso that the act shall not interfere with any vested rights theretofore acquired upon such lakes; this act became sec. 1607*a* in the Statutes of 1898, the proviso was struck out by ch. 335, sec. 2, Laws of 1917, and the law is now sec. 30.01 (1), Stats.

Whether a given body of water is navigable within the meaning here attached to that word, becomes, in the absence at least of legislative declaration, a question of fact. *Bixby v. Parish,* 148 Wis. 421, 425, 426, 134 N. W. 838; *Economy L. & P. Co. v. U. S.* 256 U. S. 113, 123, 41 Sup. Ct. 409; *Brewer-Elliott O. & G. Co. v. U. S.* 260 U. S. 77, 86, 43 Sup. Ct. 60; *U. S. v. Holt State Bank,* 270 U. S. 49, 56, 46 Sup. Ct. 197.

It is evident that as to the soil under the lake, the bed thereof, as distinguished from the body of water resting thereon, the former is *land* within the boundaries of this state, and title to all *land,* submerged or not, must rest somewhere, subject only, of course, to the declared trust as to navigation, and such title must necessarily rest either in the state as sovereign or in the riparian owners. The exact nature of the ownership; the right to possession or control, that vests in the owner of land bordering on such bodies of water, has been so fully discussed in *Milwaukee v. State,* 193 Wis. 423, 214 N. W. 820; *Doemel v. Jantz,* 180 Wis. 225, 193 N. W. 393, 31 A. L. R. 969, and in *U. S. v. River Rouge Imp. Co.* 269 U. S. 411, 418, 46 Sup. Ct. 144, that no more need now be said as to such; nor are we concerned with questions as to whether the title to land bordering on such body goes to the high or low water mark, a problem solved differently in various jurisdictions, as is pointed out in *Massachusetts v. New York,* 271 U. S. 65,

92, 93, 46 Sup. Ct. 357, and discussed in *Doemel v. Jantz,* 180 Wis. 225, 235, 193 N. W. 393.

While it has been repeatedly held by this court that the riparian owner on navigable lakes does not, and that the state does, hold title to the bed or soil thereunder, as stated in *Diedrich v. Northwestern U. R. Co.* 42 Wis. 248, 262; *Delaplaine v. C. & N. W. R. Co.* 42 Wis. 214, 225; *Boorman v. Sunnuchs,* 42 Wis. 233, 242; *Mendota Club v. Anderson,* 101 Wis. 479, 492, 78 N. W. 185; *Illinois S. Co. v. Bilot,* 109 Wis. 418, 426, 84 N. W. 855, 85 N. W. 402; *C. Beck Co. v. Milwaukee,* 139 Wis. 340, 351, 120 N. W. 293; *Doemel v. Jantz,* 180 Wis. 225, 229, 235, 193 N. W. 393, yet in none of such or other cases in this court has the question arisen as to whether the title of the state, charged as it is with an express trust, permits of the lawful disposing of substances found in, under, or as parts of such underlying soil.

Language is found in several of our decisions tending to indicate that it was the opinion of the court that the state's title carried with it no power to grant anything thereof to others, and that such title was so impressed with the public trust that there was nothing left which resembles any of the incidents of private ownership in property so far as the right to sell and dispose in whole or in part is concerned, as is illustrated in the following references to some of them: In *McLennan v. Prentice,* 85 Wis. 427, 55 N. W. 764, in an action concerning the title to lands on a water front in Ashland, and in discussion of the title of the state to submerged lands there, but which the state had not granted (p. 445), it was said (p. 444) that "The state has no proprietary interest in them; . . . while it may make a grant of them for public purposes, it may not make an irrepealable one; and any attempted grant of the kind would be held . . . subject to revocation." In *Illinois S. Co. v. Bilot,* 109 Wis. 418, 84 N. W. 855, 85 N. W. 402, in speaking of lands submerged by Lake Michigan and the

state's title to lands under all public waters of the state, the court said (p. 426) : "It cannot transfer such title by grant or otherwise," etc. And in *Rossmiller v. State,* 114 Wis. 169, 89 N. W. 839, much relied upon by plaintiffs in this case, some of the language there used does lend strong support to such contention. It involved the constitutionality of an act prohibiting the cutting of ice from any meandered lake for shipment out of the state except upon license from the secretary of state and the payment of ten cents per ton, with very drastic penal provisions for its enforcement. Its attempted justification was stated to be that such ice is state property which it can deal with as a private person deals with his own property rights. Page 179. It was there held (p. 180) that every person has constitutional rights to enjoy its public waters for every legitimate purpose, including the cutting and appropriation of ice, subject, of course, to proper police regulation; that it had not been supposed that the state could deal with public waters or anything else held upon a like trust and use such for purposes of revenue; and (p. 181), "Obviously, there can be no difference between public water in a liquid condition and in the form of ice." Had the sentence then ended it would have been all-sufficient to meet the question there presented; it continued, however, as follows: "or between *water* and the *land* covered thereby, or the fish or fowls which inhabit the same, or any of the animals *feræ naturæ,* in respect to sovereign authority over the same. If one may be dealt with as the absolute property of the state, the others may be."

The reference, therefore, to any precise similarity, so far as title in the state is concerned, between water and the land covered thereby, was *obiter* and must be so now considered. There is a substantial difference between the submerged land and the navigable water thereupon; and while it is manifestly impossible to have a navigable bed of water without a bed of land upon which it may rest, yet it is to the

bed of water as a means of navigation and as a public high-way that the state has assumed the trust, and not to the land under the same as land, for as time goes on the course of the stream may be changed or the body of water disap-pear, but the land formerly so covered and the title thereto remains. This is strikingly illustrated in *U. S. v. Holt State Bank,* 270 U. S. 49, 46 Sup. Ct. 197, *supra,* concerning the drainage of a large lake in Minnesota.

The right to take ice, therefore, as decided in this *Ross-miller Case,* was not based upon the idea of a right incident to the soil under the same, but because such was a public right incident to navigation upon the water highway in the broad sense of the term, and because such a right was not only to be free to the citizens of this state and of the United States as common highways forever, but, as should now be noted, it was to be such without any tax, impost, or duty therefor (sec. 1, art. IX, Const., *supra*), and this tax was to that extent in the nature of an embargo.

In the same case (p. 187) reference is made to the two cases of *Priewe v. Wis. S. L. & I. Co.* 93 Wis. 534, 67 N. W. 918, 103 Wis. 537, 548, 79 N. W. 780, as holding that the state has no such interest in the beds of navigable lakes that it can treat the same as a subject for bargain and sale or grant the same away to private owners under the guise of police power. These two cases, however, pre-sented very substantially different situations than here, and there it was very properly held that the state cannot arbi-trarily take away or destroy the rights of a riparian owner on a navigable lake without his consent and without compen-sation or due process of law and for any mere private pur-pose; and the facts in those cases show that what was at-tempted amounted to a virtual destruction of the entire body of water upon which the riparian owners had clearly estab-lished rights, and that it would have the effect of creating a nuisance, and was of no benefit financially or otherwise to

the state but solely to private individuals. These prior decisions of this court, or any expressions therein, do not control in this case under the rule of *stare decisis.*

Neither does the fact that such title in the lands submerged by such public waters may by accretion or reliction slowly pass from the state to the riparian owner, change the rule here, for this is an independent rule as to property, arising only when physical changes have been made by natural causes. Such other rule was recognized without question in *Hathaway v. Milwaukee,* 132 Wis. 249, 111 N. W. 570, 112 N. W. 455, to which suit, however, the state was not a party, involving apportionment to riparian owners of the large accretions caused by the breakwater in Lake Michigan at the north end of Milwaukee harbor.

Apparently in England the Crown claims the right to mines and minerals under the sea in channels and rivers subject to tidal flow and out the three miles of general international delimiting of the high seas, but there seem to be serious questions even to the present time on just what the rule is, although an act of Parliament granted rights under the sea for mining off the shores of Cornwall. 28 Halsbury, Laws of England, p. 360, par. 653. Many disputes have there arisen as to respective rights by grants, prescription, etc., for the taking of stones, sand, gravel, seaweed, etc., from the shores.

In the few cases cited or found in this country where any one of our sister states, asserting title as owner of the bed of, or soil under, navigable water, has undertaken to sell or dispose of such submerged land or valuable products thereon or thereunder, it has been held a proper exercise of such so-called private state ownership to the bed, as distinguishable from the title held in trust for the people at large in the navigable waters themselves; among such are phosphate deposits in South Carolina, *Coosaw M. Co. v. South Carolina,* 144 U. S. 550, 12 Sup. Ct. 689; sand and gravel, in

*Union S. & M. Co. v. State,* 127 Ark. 456, 192 S. W. 380,
and prior Arkansas cases there cited; phosphate, in *State v.
Black River P. Co.* 32 Fla. 82, 13 South. 640; sand, in *Wear
v. Kansas,* 245 U. S. 154, 38 Sup. Ct. 55, affirming *State ex
rel. Dawson v. Akers,* 92 Kan. 169, 140 Pac. 637.

In 1913 Michigan provided that all unpatented over-
flowed lands and lake bottom lands belonging to the state
should be leased and controlled by their state board of con-
trol.   Several thousand acres of the bed of Lake St. Clair,
by reason of the reliction of the waters, became suitable for
cottages and small homes; the state made a park of a por-
tion thereof and divided the balance into lots, which were
leased and occupied by many persons for summer cottages.
It was held in *Nedtweg v. Wallace,* 237 Mich. 14, 208 N. W.
51, 211 N. W. 647, that such could be done, although
Michigan seems committed to the doctrine that there are the
same riparian rights to the center in the lakes, except the
Great Lakes, as there is to the thread of the rivers.   *Sewers
v. Hacklander,* 219 Mich. 143, 188 N. W. 547; *Collins v.
Gerhardt,* 237 Mich. 38, 211 N. W. 115.   In *U. S. v. Holt
State Bank,* 270 U. S. 49, 52, 46 Sup. Ct. 197, *supra,* Minne-
sota authorized the drainage of a lake and thereafter sold
the lands so uncovered, and such action was upheld.

The control over the oyster beds in tide waters has always
been recognized as in the state bordering the tide waters
rather than in the federal government or any private ripa-
rian owners.   *Martin v. Waddell,* 16 Pet. (41 U. S.) 367;
*Louisiana v. Mississippi,* 202 U. S. 1, 26 Sup. Ct. 408, which
was a contest because of legislation, evidently conceded to
be within the power of the respective states, concerning the
fishing of oysters in the Gulf of Mexico, and where threat-
ened resort to bloodshed to settle the dispute by armed bands
in each state was averted by that resort to the court.   *Mc-
Cready v. Virginia,* 94 U. S. 391, 396, upheld the right of
Virginia to exclude all but her citizens from the privilege of

oyster fishing; and *Lewis B. P. O. C. Co. v. Briggs,* 229
U. S. 82, 86, 33 Sup. Ct. 679, is in point.   The same doctrine
was declared as to sponges found in tide waters and that
Congress had no power to legislate thereon, in *The Abby
Dodge,* 223 U. S. 166, 175, 32 Sup. Ct. 310.

Although New York apparently declines to follow the
doctrine that the state as sovereign takes the *jus privatum*
of the sovereign at common law as distinct from the *jus
publicum, Appleby v. New York City,* 235 N. Y. 351, 363,
139 N. E. 474 (affirmed, 271 U. S. 364, 46 Sup. Ct. 569),
yet grants to towns by charters in colonial days of submerged
tide-water lands have been sustained as against the state
itself and others.   *Tiffany v. Oyster Bay,* 209 N. Y. 1, 102
N. E. 585; *Same v. Same,* 234 N. Y. 15, 136 N. E. 224,
24 A. L. R. 1267.

We are of the opinion, and so hold, that ch. 410, Laws of
1923, creating sec. 31.02 (5), Stats., was within the power
of the legislature to enact, and that no rights of the plaintiffs
under the federal or state constitutions are invaded by such
an act, when carried out as we declared in the beginning of
this opinion.

Although no mention is made in this statute of the rights
of riparian owners, as such, to such navigable waters, yet
of course the presumption is that the legislature did not
intend to give thereby, leave or license to persons acting
thereunder to invade or injure the rights and privileges of
riparian owners on such navigable waters, or to take away
from such owners or others injured in the carrying on of
such work the usual remedies for wrongs.   Neither do we
now determine whether any arrangement made with the
*Commission* under this law would relieve a party thereto
from the necessity of obtaining the consent of local au-
thority or from being subject to the penalties prescribed in
sec. 348.42, Stats., prohibiting, to other than riparian own-
ers, the taking of sand, gravel, clay, or other substances

from navigable waters in this state without prior consent of the local authorities.

Neither is there here presented the question as to the rights of riparian owners on rivers to so remove material from such navigable waters.

*By the Court.*—Judgment reversed.