KRENZ, Appellant, vs. NICHOLS, Respondent.
SAME, Respondent, vs. SAME, Appellant.

*November 9—December 4, 1928.*

*Frank B. Keefe* of Oshkosh, for the plaintiff.
*L. W. Hull* of Oshkosh, for the defendant.

CROWNHART, J. Ch. 29 of the Statutes, entitled "Fish and Game," deals generally with the propagation, hunting, trapping, fishing, and disposition of such fish and game in the state of Wisconsin. This chapter, comprising sixty-three sections, legislates in detail as to all the various matters connected with the subject. Its enforcement and administration is put under the jurisdiction of the Conservation Commission. The Conservation Commission was created by sec. 23.09 of the Statutes to provide an adequate and flexible system for the protection, development, and use of forests, fish and game, lakes, streams, plant life, flowers, and other outdoor resources in the state of Wisconsin, and is given very broad and comprehensive powers in regard thereto.

Sec. 29.575 provides for the licensing and regulation of muskrat farms. Sec. 29.576 provides for the regulation and operation of beaver farms, and sec. 29.577 provides for the regulation of other fur-animal farms, including mink, otter, marten, fisher, raccoon, and skunk. Sec. 29.575 is the section affecting this action, and is printed in the margin.[1]

[1] 29.575 *Muskrat farms.* (1) The owner or lessee of any lands within the state of Wisconsin suitable for the breeding and propagating of muskrats shall have the right upon complying with the provisions of this section to establish, operate and maintain on such lands a muskrat farm, for the purpose of breeding, propagating, trapping and dealing in muskrats.

(2) Such owner or lessee desiring to establish, operate and maintain a muskrat farm in conformity with this section, shall file with the conservation commission a verified declaration describing the lands which such applicant for a license desires to use for the purpose of breeding and propagating muskrats, and setting forth also

The other two sections dealing with fur-bearing animals are of very similar import. Sec. 29.02 provides:

"(1) The legal title to, and the custody and protection of, all wild animals within this state is vested in the state for the purposes of regulating the enjoyment, use, disposition, and conservation thereof.

"(2) The legal title to any such wild animal, or carcass

---

the title or leasehold of the applicant and the number of acres embraced in said tract.

(3) Upon the filing of such declaration the conservation commission shall forthwith investigate the same and may require the applicant to produce satisfactory evidence of the facts therein stated. If upon such examination it shall appear that the applicant is the owner or lessee of said lands, and that the applicant intends in good faith to establish, operate and maintain a muskrat farm, the commission shall issue a license to the applicant describing such lands, and certifying that the licensee is lawfully entitled to use the same for the breeding, propagating, trapping and dealing in of muskrats thereon.

(4) Thereupon the commission shall appoint one man, the applicant one man, and these two shall select a third man to act as a board to go upon the lands embraced within the license, and determine as near as possible the number of muskrats thereon at the time of the granting of the license. The necessary expenses of all of the members of such board shall be paid by the licensee. Within ten days after the date of such determination, the licensee shall pay to the conservation commission fifty cents for each muskrat so found on such lands. When such payment has been made the licensee shall become the owner of all of the muskrats on said lands and of all of their offspring remaining thereon. He shall have the right to manage and control said lands and the rats thereon, to take and trap the same at any time or in any manner which he sees fit and deems to the best advantage of his business, and to sell and transport at any time said muskrats or the pelts taken from them. All such pelts so transported shall be tagged with a tag to be furnished by the conservation commission to the licensee at cost, not exceeding one cent each. Such tags shall be numbered to correspond with the number of the license held by the licensee.

(5) The holder of any such license shall pay an annual license fee of two dollars and fifty cents for any such farm of ten acres or under, and an additional fee of fifteen cents per acre for any additional land actually devoted to muskrat farming.

(6) Within thirty days after the date of the issuance of any such license, the licensee shall erect posts or stakes at intervals of not more than twenty rods along the boundary of the land embraced in said license, wherever the same are not already inclosed, and shall post and maintain upon said posts, stakes or other inclosures at in-

or part thereof, taken or reduced to possession in violation of this chapter, remains in the state; and the title to any such wild animal, or carcass or part thereof, lawfully acquired, is subject to the condition that upon the violation of any of the provisions of this chapter relating to the possession, use, giving, sale, barter, or transportation of such wild animal, or carcass or part thereof, by the holder of such title, the same

tervals of not more than twenty rods notices furnished by the conservation commission proclaiming the establishment of a muskrat farm. For such notices the licensee shall pay to the conservation commission the sum of twelve cents each.

(7) Such license shall be *prima facie* evidence in all courts and proceedings of the lawful right of the licensee therein named, his or its successors or assigns, for the term of the license, to establish and operate a muskrat farm upon said premises, and shall entitle the licensee therein named or his successors or assigns, to the exclusive right for and during said term to breed and propagate muskrats thereon, and to the exclusive and sole ownership of any property in all muskrats caught or taken therefrom. Such licenses shall expire on the thirty-first of December of each year, but may be renewed from year to year upon payment by the licensee of the annual license fee.

(8) Any person other than the licensee or his agents who shall hunt or trap muskrats upon any lands described in any such license, shall be liable to the licensee in the sum of twenty-five dollars, in addition to all damage which he may do to said farm or to the rats and property thereon, but all actions for such trespass shall be brought by such licensee.

(9) On or about the first day of March of each year, each such licensee shall make a report, verified by affidavit, to the conservation commission, covering the period from the first day of January to the thirty-first day of December of the previous year, upon blanks furnished by the commission, stating the number of his license and the total number and value of muskrats killed, transported or sold from said muskrat farm, and such other information as the commission may require.

(10) Nothing in this section shall be construed to affect any public right of hunting, trapping, fishing or navigation except as herein expressly provided.

(11) Any person operating a muskrat farm under licenses granted by the provisions of this chapter, shall not trap any animals for pelting purposes during the close season provided for by this chapter, except on a permit granted by and under supervision of the state conservation commission; and all skins of such animals so taken during close season shall be distinctively tagged or marked by the conservation commission. No muskrats on licensed farms shall be killed at any time by gun shot or spear.

shall revert, *ipso facto,* to the state. In either case, any such wild animal, or carcass or part thereof, may be seized forthwith, wherever found, by the state conservation commission or its deputies."

The plaintiff's position is that sec. 29.575 is a valid law, and that the acts of the defendant were in violation thereof; and he claims he has title to the soil to the thread of the stream, and any interference with that soil or land adjacent thereto constitutes a trespass.

The defendant contends that sec. 29.575 is void and of no effect, and that the defendant has a right to hunt and fish, including the taking of fur-bearing animals, in the navigable streams of the state as incidental to the rights of navigation; that so long as he remains in the boat which he navigates on the waters, in any customary or usual manner, and takes wild game, including fur-bearing animals and fish, from such waters, he is within his rights, subject only to the right of the state of Wisconsin to regulate the time and manner of taking such animals.

It is a familiar and oft-quoted principle of law that the legislature, as the direct representative of the people, has all powers of legislation not limited by the federal or state constitutions. No specific provision of either constitution is pointed out by the defendant against which the act offends. All the authorities are to the effect that the state holds title to the wild animals in trust for the people. No individual has any title to any such animal until he reduces it to lawful possession. As trustee for the people, the state may conserve wild life and regulate or prohibit its taking in any reasonable way it may deem necessary for the public welfare, so long as it does not violate any organic law of the land.

There is quite a common belief prevalent that wild animals are of common right open to capture and possession by the public, and restrictions thereto must be limited and reasonable. This belief, no doubt, comes as a heritage of pioneer

days, when no necessity existed for such restrictions, and when the people were largely dependent upon hunting and fishing, but that time has long since passed. . It is now generally recognized that valuable wild animal life would soon be exterminated if the state should fail to conserve it and aid in its reproduction. Whenever the 'state has done so without trenching on private rights protected by the constitution, such acts have been almost uniformly upheld. To that end legislation has been held valid regulating the taking of fish from a public lake and providing for the destruction of nets used contrary thereto, *Bittenhaus v. Johnston,* 92 Wis. 588, 66 N. W. 805; prohibiting the shipment or sale of more than a stated quantity of fish at one time, although the same has been legally taken, *State v. Nergaard,* 124 Wis. 414, 102 N. W. 899; prohibiting the possession of the skins of certain fur-bearing animals, *Cohen v. State,* 180 Wis. 352, 192 N. W. 992; regulating the right of planting and taking oysters or other shell fish, 26 Corp. Jur. p. 609, and cases cited; restrictions for the catching of fish, even to the extent of restricting the use of, or right of property in, the fish after they are taken, and of obliging all citizens to conform to such regulations by inflicting penalties for the violation thereof, 26 Corp. Jur. p. 623, and cases cited. Substantially the same rules apply to the conservation of game as to fish. 27 Corp. Jur. p. 945.

This court has treated fur-bearing animals in the same category as fish and game. *Cohen v. State,* 180 Wis. 352, 192 N. W. 992. The same principle of conservation has been applied by the federal government, by law and by treaty, to seal catching, 26 Corp. Jur. p. 616; likewise an act of Congress to carry out the treaty regulation as to migratory birds has been upheld, *Missouri v. Holland,* 252 U. S. 416, 40 Sup. Ct. 382; statutes regulating the taking of migratory fish are held valid, 26 Corp. Jur. p. 630, and cases cited. Nearly every conceivable regulation for the propagation,

conservation, taking, and disposal of fish and game has been upheld where no constitutional objections have stood in the way. Generally, courts have given very liberal construction to such statutes, to the end that the public welfare should be subserved.

The state, under its police power and to carry out its trust, passed the statute in question. So far as it affects the public the statute is reasonable and is not contrary to any provision of the federal or state constitutions. Nor do we think it is contrary to the decision of this court in *Diana Shooting Club v. Husting,* 156 Wis. 261, 145 N. W. 816. In that case the court upheld the right of a citizen of the state to hunt from a boat in the navigable inland streams of the state, notwithstanding that the boat should be on the waters over the lands of a private owner. The court there said that was a right incident to the right of navigation, and that the right of navigation was free to all the citizens of the state upon such waters, by virtue of the Ordinance of 1787, the enabling act of the state constitution, and the constitutional provision thereto.

While hunting and fishing may be an incident of navigation it does not depend on navigation, nor does navigation depend upon the privilege of hunting and fishing. They are distinct and independent of each other, and are drawn from different sources. Nor can it be reasonably said that hunting and fishing are in any way protected by the Ordinance of 1787 or the constitution of this state incorporating the same therein. The phrase "forever free" refers to the "common highways" and protects such highways from "any tax, duty or impost therefor." The court, in *Willow River Club v. Wade,* 100 Wis. 86, 76 N. W. 273, and *Diana Shooting Club v. Husting,* 156 Wis. 261, 145 N. W. 816, was not confronted by any statute of the state regulating the right to take fish or game. It merely passed upon the relative rights

of the fisherman and the hunter, on the one side, and the riparian owner of the soil underneath navigable waters, on the other side. Here we have a statute aimed to conserve the property of the state which it holds in trust for the public. It should be given a liberal construction to sustain its validity, and it cannot be set aside unless it clearly violates the organic law of the nation or state. The legislature has declared the title to all wild animals to be in the state of Wisconsin, for the purpose of regulating their use and enjoyment, and it has regulated the whole subject of propagation, hunting, fishing, and disposition of wild animals, in the interest of the public.

In *Angelo v. Railroad Comm.* 194 Wis. 543, 217 N. W. 570, we held that the state may legally dispose of marl in the bed of an inland navigable lake for profit, where the same is done without interference with the right of navigation under the Ordinance of 1787, and the constitution enacted pursuant thereto. In *Doemel v. Jantz,* 180 Wis. 225, 193 N. W. 393, it is held that the bed of such a lake is held by the state in trust for the people, and it is held to the same effect in the *Angelo Case, supra.*

In this case the state did no more than to dispose of a limited number of rats as an incident of its conservation policy, but the state does not sell the animals as a commercial venture.

The act in question, sec. 29.575, Stats., is an exercise of the state's power in carrying out its large and comprehensive conservation program of promoting and protecting the public resources and the comfort and happiness of its people. The supreme court of the United States, in *Lacoste v. Dept. of Conservation,* 263 U. S. 545, 44 Sup. Ct. 186, upheld a law of Louisiana, and went much further than we are required to go here to sustain the act in question. There a tax was levied upon furs taken from animals captured in the state,

in the hands of dealers. The Louisiana act also covered regulations in detail of the whole subject of hunting, trapping, and disposition of the furs so taken. We quote some of the pertinent expressions of the law from the opinion:

"The wild animals within its borders are, so far as capable of ownership, owned by the state in its sovereign capacity for the common benefit of all of its people. Because of such ownership, and in the exercise of its police power, the state may regulate and control the taking, subsequent use, and property rights that may be acquired therein. . . . The legislation is a valid exertion of the police power of the state to conserve and protect wild life for the common benefit. It is within the power of the state to impose the exaction as a condition precedent to the divestiture of its title and to the acquisition of private ownership. . . . Wild animals permitted by the state to be taken and reduced to possession on prescribed conditions may reasonably be distinguished from other classes of property. . . . Protection of the wild life of the state is peculiarly within the police power, and the state has great latitude in determining what means are appropriate for its protection." *Lacoste v. Dept. of Conservation,* 263 U. S. 545, 44 Sup. Ct. 186.

The decision held the Louisiana act constitutional, and the same principle applies to the act here in question. This court has held in effect that the act does not offend against the state constitution. *Cohen v. State,* 180 Wis. 352, 192 N. W. 992. The statute is a valid enactment under the police power of the state.

*By the Court.*—The judgment of the county court is modified and enlarged to sustain the validity of sec. 29.575, Stats., and as so modified it is affirmed, with costs to plaintiff.