STATE EX REL. HAMMANN and others, Plaintiffs, vs. LEVITAN, State Treasurer, and others, Defendants.

*June 6—December 3, 1929.*

272

274

For the plaintiffs there were briefs by *Thompson, Myers & Helm* of Racine and *L. S. Keeley* of Mayville, attorneys, and *Ralph W. Jackman* of Madison, of counsel, and oral argument by *Mr. Ralph W. Jackman, Mr. Peter J. Myers, Mr. L. S. Keeley,* and *Mr. W. L. Jackman.*

*John W. Reynolds,* attorney general, and *T. L. McIntosh,* assistant attorney general, for the defendants.

ROSENBERRY, C. J.   The right of the conservation commission to proceed to carry out the provisions of this legislation is challenged on the ground that the acts are unconstitutional and void because as to ch. 475 in contravention of the provisions of art. IV, sec. 18, of the constitution of the state of Wisconsin, which provides:

"No private or local bill which may be passed by the legislature shall embrace more than one subject, and that shall be expressed in the title."

Both chapters are challenged on the ground that they are in conflict with art. VIII, sec. 10, the material part of which is as follows:

"The state shall never contract any debt for works of internal improvement, or be a party in carrying on such work. . . ."

In support of the first proposition it is argued, first, that the act is local. This much must be at once conceded,—the act relates to the creation of a wild-life refuge on the Horicon marsh and within the decisions it is a local act. *State ex rel. Richter v. Chadbourne,* 162 Wis. 410, 156 N. W. 610, and cases there cited.

It is next argued that it embraces in its title more than one subject and contains provisions which are not disclosed by the title. In *Evans v. Sharp,* 29 Wis. 564, this court definitely accepted the interpretation of this clause of the constitution placed upon similar language contained in the constitution of the state of New Jersey by the court of that state and quoted with approval the following language:

"The unity of the object must be sought in the end which the legislative act proposes to accomplish, and not in the details provided to reach that end. The degree of particularity which must be used in the title of an act rests in legislative discretion, and is not defined by the constitution. There are many cases where the object might with great propriety be more specifically stated, yet the generality of the title will not be fatal to the act, if by fair intendment it can be connected with it."

To the same effect are the prior decisions of this court. See *Dean v. Charlton,* 23 Wis. 590; *Mills v. Charleton,* 29 Wis. 400.

Because the title to the bill in this case is specific, it is argued that the specific and particular provisions constitute more than one subject and are not parts of a whole. The quite evident purpose of ch. 475 is to authorize the institution by the conservation commission of a wild-life refuge

on Horicon marsh. In order to accomplish the general purpose certain other specific things are necessarily or properly incident thereto. There must be a dam to raise the water level. When the wild-life refuge is instituted, certain incidental steps in the judgment of the legislature should be taken, such as the establishment of a fish hatchery, the establishment of a fur farm, and, so far as the works authorized by the statute permit, the control of the flood waters of Rock river. If any one of these subsidiary steps were to be entered upon by the state as a sole and distinct enterprise, other and serious questions would be presented. It is very doubtful whether the legislature could authorize the state to enter into the business of raising fur. It is equally doubtful whether it could authorize the agricultural college to enter into the business of raising wheat, tobacco, or other agricultural products. However the state does all of these things as a necessary and proper incident to the carrying on of a school of agriculture. If the authorities charged with the execution of the law should depart from the fundamental purpose and make the incidental the dominant purpose, it is quite probable they could be brought within their proper sphere by court action. The erection of a dam for the purpose of controlling flood waters would undoubtedly be a work of internal improvement. Here the dominant purpose is the creation of a wild-life refuge, and as an incident to it the establishment of a fur farm, dam, and a fish hatchery. We see nothing in the title to the bill which within established principles makes it unconstitutional as violative of sec. 18 of art. IV.

In November, 1912, sec. 3a of art. XI became a part of the constitution of this state by way of amendment.

"Section 3a. The state or any of its cities may acquire by gift, purchase, or condemnation lands for establishing, laying out, widening, enlarging, extending, and maintaining memorial grounds, streets, squares, parkways, boulevards, parks, playgrounds, sites for public buildings, and reserva-

tions in and about and along and leading to any or all of the same; and after the establishment, layout, and completion of such improvements, may convey any such real estate thus acquired and not necessary for such improvements, with reservations concerning the future use and occupation of such real estate, so as to protect such public works and improvements, and their environs, and to preserve the view, appearance, light, air, and usefulness of such public works."

The question of whether or not the state may expend public funds in the creation of a wild-life refuge was argued in the original briefs without reference to this section, which came to the court's attention during the consideration of the case. Thereupon the court directed counsel to file briefs on the following proposition:

"Is chapter 475 of the Laws of 1927, relating to a state wild-life refuge, fur farm, and dam on Horicon marsh, an exercise of the power vested in the state by section 3a of article XI of the constitution of the state of Wisconsin?"

Such briefs have been filed and the whole matter has again been reconsidered. Ch. 475 of the Laws of 1927 has already been set out *in extenso* and it is not necessary to repeat its provisions at this point. That the project authorized in ch. 475 does not conform to the conventional idea of what constitutes a park must be conceded at the outset. Blackstone defines a park as follows:

"A park is an inclosed chase, extending only over a man's own grounds. The word 'park,' indeed, properly signifies an inclosure; but yet it is not every field or common which a gentleman pleases to surround with a wall or paling and to stock with a herd of deer that is thereby constituted a legal park; for the King's grant, or at least 'immemorial prescription,' is necessary to make it so." Blackstone's Commentaries, Book II, p. 38.

In the United States the word "park" is most frequently used to designate a piece of ground maintained for the benefit of the public, or ornament, scenic beauty, and as a place for the resort of the public for recreation and amusement. 20 Ruling Case Law, p. 638 and cases cited.

In *Riverside v. MacLean,* 210 Ill. 308, 71 N. E. 408, 414, a park was defined as "a place for the resort of the public for recreation, air, and light."

In *Northport W. G. C. Asso. v. Andrews,* 104 Me. 342, 71 Atl. 1027, 1030, it is defined "as a piece of ground set apart to be used by the public as a place of rest, recreation, exercise, pleasure, amusement, and enjoyment."

In *Comm. v. Hazen,* 207 Pa. St. 52, 56 Atl. 263, 264, the court had under consideration whether or not a private game and fish preserve came within the meaning of the word "park." It is there said:

"It may be conceded that the word 'park' has been used in other ages and in other countries, occasionally, to mean a tract of land inclosed and stocked with beasts of chase, such as that described by Xenophon as belonging to Cyrus, King of Persia, filled with wild beasts, which he hunted on horseback. . . . The American meaning of 'park' is that definition given in the Century Dictionary (No. 3): 'A piece of ground set apart and maintained for public use, and laid out in such a way as to afford pleasure to the eye as well as opportunity for open-air recreation.' This definition gives the common understanding of the term. It fits Fairmount Park, Philadelphia, Central Park, New York, Highland Park, Pittsburg, and probably every public park in the country. It is not applicable to private inclosures, enjoyed by the few to the exclusion of the public. It is not applicable to a game and fish preserve, which the subject of this act clearly is, as understood both in this country and in England."

The act under consideration was "An act to incorporate the Blooming Grove Park Association," which was for a private purpose and to do business under a particular name. The court held that the word "park" in the title was not applicable to a private inclosure enjoyed by a few nor to a private game and fish preserve, and therefore did not comply with the constitution of the state of Pennsylvania, which required the subject of the act to be clearly expressed in its title.

These and other definitions are not very helpful in enabling us to determine the intent and purpose of the amendment to our constitution. It is apparent that in conferring the power upon the state to acquire lands for park purposes there must have been in mind a purpose beyond that to be achieved by the ordinary city park devoted purely to recreational and ornamental purposes. The state would have little or no occasion to create a park of that kind, such parks ordinarily being provided by municipalities. It is quite apparent also that the term "park" is often used in a wider and much more general sense. The Yellowstone Park, the Yosemite Park, the Adirondack Park Preserve, Glacier Park, Jasper Park, and National Park are all examples of wide areas set apart by the state, national, or dominion governments for the purpose of preserving them as nearly as possible in a state of nature in order to protect and encourage the preservation and growth of the fauna and flora of the region. The state of Wisconsin has already acquired large areas in the northern part of the state and owns large tracts of land devoted to parks, forests, and forest plantations. (See chs. 27 and 28, Wis. Stats.)

A consideration of the whole field of federal and state activity in this realm leads us without difficulty to the conclusion that ch. 475 of the Laws of 1927 is well within the authority conferred by sec. 3a of art. XI, although this project does not conform to the popular idea or notion of a park. We should not place a narrow or restricted construction upon a constitutional amendment so obviously intended by the people to confer authority upon the state to promote the general welfare in this field. As the country emerges more and more from pioneer conditions, problems connected with public recreation become more and more prominent. Compared with former times the people of this country enjoy a large amount of leisure. The proper employment of this leisure constitutes one of our newest but in

many respects one of our most important problems. Whether leisure is a social asset or a social liability depends upon the use which is made of it.[1]

What should be done in the way of providing public recreation is in the first instance a matter of legislative discretion. Whether the project set up in the laws under consideration here is the best or wisest method of expending public funds is a matter for the determination of the legislature. The establishment of parks for the use of the public, the building of zoological gardens and small game preserves have for a very long time been undertaken through the expenditure of public funds. The present project appears to us to be merely a variation from and to some extent a combination of ideas already worked out along similar lines. It is therefore well within the constitutional field.

A somewhat similar question was before the supreme

---

[1] *The Threat of Leisure,* by George Barton Cutten, pub. by Yale University Press, 1926.

*Recreation Resources of Federal Lands,* Report of Joint Comm. on Recreational Survey of Federal Lands of Am. Forestry Assn. and National Parks Assn. to National Conference on Outdoor Recreation, 1928.

*The Conservation of our Natural Resources and of our National Strength and Virility,* U. of Penn. Law Rev. and Am. Law Reg., vol. 58, p. 125, 1909–10.

*A Report Epitomizing the Results of Major Fact-Finding Surveys and Projects which have been Undertaken under the Auspices of National Conference on Outdoor Recreation,* Senate Document No. 158, 70th Congress, 1st session.

*Some Problems of Recreational Land,* by George S. Wehrwein, Journal of Land and Public Utility Economics, May, 1927.

*State Parks and Recreational Uses of State Forests* in the U. S., by Raymond H. Torrey, Field Sec'y Nat'l Conf. on State Parks, 1926.

*Governmental Interest in Recreation,* 1927. A contribution to a Bibliography by Aune E. Martin, Madison.

*Report of the Westchester County (N. Y.) Recreation Commission,* 1925.

*Management and Control of Tourist Camps in Minnesota,* The League of Minnesota Municipalities, Pub. No. 10; *Tourist Camps* by Rolland S. Wallis, Iowa State College of Agric. and Mech. Arts, Official Pub., vol. XXI, No. 36, Feb. 7, 1923.

court of the state of Minnesota in *Lyman v. Chase,* 226 N. W. 633. The court said:

"Appellant does not controvert, what we take to be settled law, that the legislature has power to appropriate public funds and direct taxes to be levied for the acquisition and maintenance of public parks. . . . To establish a territory for wild life, such as game and fish, so that the inhabitants of the state may therein procure the recreation and profit that regulated hunting and fishing afford, is equally for a well-recognized public purpose, to say nothing of fostering other natural resources, such as the growth of forests."

The conclusion at which we have arrived makes it unnecessary for us to consider whether or not the creation of the wild life and game refuge is an internal improvement within the meaning of sec. 10 of art. VIII. The acquisition of parks as well as the construction and improvement of public highways, the acquisition, preservation, and development of forests, have been withdrawn from constitutional ban if they were ever within it, leaving no question for consideration in that respect.

It is considered that the proper public authorities may proceed to carry out the provisions of the laws in question; that the petition for a permanent injunction restraining the expenditure of public funds should be denied and the petition should be dismissed.

*By the Court.*—It is so ordered.

CROWNHART, J. (*concurring*). I concur in the decision, but would prefer to have the judgment based on the police power of the state.

We held in *Krenz v. Nichols,* 197 Wis. 394, 222 N. W. 300, that the title to all wild animals is in the state, in trust for the public. The state has the undoubted right to protect and preserve such animals in the public interest, with all the necessary concomitants. That carries the right to impound, breed, propagate, distribute, and generally do all

things necessary or proper to promote the public rights in such animals. That of course includes the acquiring of lands for fish hatcheries, breeding grounds for fur-bearing animals, and refuges for birds and aquatic fowl. There can be no reasonable ground for any claim that in doing these things the state is engaging in acts of internal improvement in violation of sec. 10, art. VIII, of the constitution. "Internal improvements" had a well understood meaning when the constitution was adopted, and was not then, nor has it since been, understood as preventing the state from exercising its general police powers. This state has for many years maintained fish hatcheries to promote and develop the propagation and distribution of fish in the public waters of the state, in the public interest. It has experimental farms to develop farm products, and their adaptation to the various soils and climatic conditions of the state. It conducts experimental farms to develop animal husbandry, whereon horses, cattle, sheep, hogs, and all kinds of tame fowl are bred and developed in the public interest. On such farms diseases peculiar to crops of various kinds, and to animals, are studied and their prevention and remedies are sought and made known as a part of our educational system. All these things I think are done, and may be done, under the police power of the state.

The development of Horicon marsh, under the law in question, for the purposes therein indicated, is clearly within the police power of the state as practically applied ever since the state has had existence. The police power is a very broad and comprehensive power of a state to promote the general welfare, and it should not be curtailed except by clear and positive constitutional prohibitions, expressed or necessarily implied.

A similar law of Minnesota has been recently upheld under the police power of the state. *Lyman v. Chase* (Minn.) 226 N. W. 633.